Leon WILLIAMS, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

The YAZOO VALLEY–MINTER CITY OIL MILL, INC., also known as the Minter City Oil Mill, Inc., Defendant.

No. GC 76–77–S.

United States District Court, N. D. Mississippi, Greenville Division.

Nov. 22, 1978.

Charles Victor McTeer, Greenville, Miss., for plaintiffs.

H. D. Brock, Whittington, Brock & Swayze, Greenwood, Miss., for defendant.

## MEMORANDUM OF DECISION

ORMA R. SMITH, District Judge.

The action sub judice having been submitted to the court, sitting without a jury, and the court now having considered the evidence introduced and the entire proceedings in this action, does hereby adopt findings of fact and conclusions of law as required by Rule 52(a), Fed.R.Civ.P.

## FINDINGS OF FACT

A. *Leon Williams' Individual Discharge.*

1. Leon Williams is a member of the black race.

2. Leon Williams became a solvent plant operator at the Minter City Oil Mill in 1973 and worked in that position until his discharge on December 20, 1974.

3. The solvent plant is the most important stage of the production process at the Minter City Oil Mill. In the solvent plant, hexane gas is used to extract oil from cotton seed. When the solvent plant is shut down, the Minter City Oil Mill is not producing its primary end products, cotton seed oil and cotton seed meal. The net loss to the mill when the solvent plant is not in operation during the mill season is approximately $1,500 per hour. The solvent plant requires the constant, undivided attention of the solvent plant operator.

4. The immediate incident which brought about the discharge of Leon Williams was Williams' actions in shutting down the solvent plant at approximately 8:00 P.M. on Saturday, December 14, 1974, and his conduct during a conference with the mill management concerning this shutdown on the following day, Sunday, December 15, 1974.

5. There are a number of reasons why the solvent plant might necessarily have to be shut down during mill operation, such as a lack of raw materials coming into the solvent plant or a breakdown of machinery. Such reasons require the automatic shutdown of the mill without a judgment decision having to be made by the solvent plant operator and shift foreman.

6. The reason stated by Leon Williams as to why he shut the solvent plant down on December 14, was that he felt the meal was too "wet", causing a drag on the machinery. Williams' decision to shut down the solvent plant was based on his own decision and was not the type of condition, such as the lack of raw materials or a breakdown of equipment, which cause automatic shut down of the solvent plant.

7. Written duties for solvent plant operators have been posted in the solvent plant office, called the "flash room", since first placed there by W. P. Hayne, plant manager, in 1973. These written rules for solvent plant operators are plainly visible and have been seen and observed by solvent plant operators.

8. The written duties for solvent plant operators include the following:

8. Report any problem or trouble to foreman immediately.

. . . . .

13. Operator should not leave solvent plant except to run tests, to check with prep room, or emergency or necessity.

9. Leon Williams came on duty at 3:00 P.M. on Saturday, December 14.

10. Williams did not shut down the solvent plant until approximately 7:30 to 8:00 P.M.

11. During the interval of time from his coming on duty on December 14, until he shut down the solvent plant, Leon Williams did not contact his shift foreman concerning the condition of the meal in the solvent plant.

12. The failure to contact his shift foreman concerning the condition which he claims to have observed in the solvent plant as early as 3:00 P.M. was a violation of the Work Rules for solvent plant operators.

13. Leon Williams had been warned on at least one previous occasion not to shut down the solvent plant on the basis of his own judgment without first contacting the shift foreman.

14. The action of Leon Williams in shutting down the solvent plant on the basis of his opinion regarding the condition of the meal was in violation of instructions which he had received from the mill management.

15. A conference was held on Sunday, December 15, concerning Williams' shutting down the solvent plant on the previous day. Attending this conference were W. P. Hayne, plant manager; Walter McLaughlin, assistant superintendent; Donald Kersh, shift foreman; and Leon Williams.

During this conference, according to the testimony of McLaughlin and Hayne, Leon Williams stated that he was going to operate the solvent plant as he saw fit and he was not going to follow the directions of the shift foreman.

16. Hayne did not terminate Williams at the time of the conference but took the decision on his discharge under advisement until the end of the current pay week.

17. Hayne decided to terminate Williams on Friday, December 20. Williams was discharged when he picked up his weekly paycheck.

18. Hayne's decision to terminate Williams took into account a number of factors including:

(a) Williams' job performance on Saturday, December 14, when he failed to notify his shift foreman of problems with the meal and failed to notify his shift foreman before he closed down the solvent plant on the basis of his own judgment decision;

(b) Williams' insubordinate attitude at the conference on December 15, 1974;

(c) the background of Williams' employment history including his refusal to remain on his job and in his work area during working hours (which was a violation of Work Rules), and his interference with the activities of other employees during working hours.

19. Williams' insubordinate actions and statements came at a time when W. P. Hayne was trying to establish an orderly chain of authority at the Minter City Oil Mill so that total responsibility for the plant operation could be placed on a designated supervisor. This reorganization was in contrast to previously disorganized management practices and was necessary for the Mill's continued operation.

20. The decision to discharge Leon Williams was for good cause.

21. The decision to discharge Leon Williams was in no way based on his race.

22. There is no evidence that any solvent plant operator who is white has conducted his job in the same manner and with the same attitude toward supervisors as Leon Williams and has been retained in the company's employment.

23. Leon Williams was replaced as solvent plant operator by Bennie Ratliff, a black male, who had previously been a solvent plant operator and was at the time of Williams' discharge working in the maintenance department.

B. *Williams' Claim of Failure to Promote.*

24. The plaintiff, Williams, was promoted to solvent plant operator at his request. On one occasion he mentioned the shift foreman position to a supervisor but was not given the position.

25. Williams admits that he is not qualified to hold the position of plant superintendent.

26. From 1971 through 1973, there was no vacancy in the position of shift foreman. In 1974, there was only one occasion on which a vacancy in the position for shift foreman was filled. After the retirement of A. D. McGee, a black shift foreman, on March 30, 1975, three black employees, Bennie Ratliff, Charlie Phillips and Wilbert Hughes, were asked to accept the position of shift foreman. All three, Ratliff, Phillips, and Hughes, subsequently became shift foremen.

27. There was no racial discrimination involved in not promoting Leon Williams to a position higher than solvent plant operator.

C. *Hiring and Job Assignments.*

I. *Hiring Practices Generally.*

28. Historically, the Minter City Oil Mill has hired and employed many more blacks than whites.

29. Because of the location of the Mill in a predominantly rural area, the labor force available for employment consists mostly of agricultural workers, predominantly black, who come to the plant seeking work.

30. The Mill has also sought referrals from the Mississippi State Employment

Service and word of mouth referrals from current employees. Due to the predominantly black composition of the existing work force, word of mouth referrals tend to favor black persons.

31. Written job applications are taken from applicants applying at the front offices of the Mill; however, most new employees go directly to the superintendent's office in the plant where written applications and/or employment data are taken from the applying parties. The Mill does not use written tests or other screening methods which might tend to exclude poorly educated blacks (or whites) from initial employment.

32. Defendant's hiring procedures do not discriminate against blacks on account of their race, and in effect have favored the employment of large numbers of black persons from the local Minter City area.

## II. Initial Job Assignments.

33. Most new employees, black or white, who have no relevant previous experience, have been hired at or only slightly more than the minimum wage. The relatively small number of such whites who applied and were hired as general hourly employees, have had the same or comparable starting job assignments and wages as their black counterparts. (See generally Plaintiff's Exhibits 1 and 2.)

34. For illustration, the list of all new white hourly general employees initially hired on or after January 1, 1973, derived from Plaintiff's own Exhibits P–2c through P–2h, shows that there have been 13 such employees as follows:

| | | | |
|---|---|---|---|
| 1973 | Crick, W. M. | Seed weigher | $1.85 |
| | Christian, James | Seed sampler | 1.85 |
| | Goss, Roger | Sampler/tow motor | 1.85 |
| | McLaughlin, David | Solvent plant | 2.00 |
| 1974 | Rayburn, Earl | Yard worker | $2.00 |
| | Evans, James | Yard worker | 2.00 |
| | Gregg, Luther Ray | Helper | 2.00 |
| | Bradshaw, Grady | Sampler/tow motor | 2.10 |
| | Methvin, Reginald, Jr. | Seed sampler | 2.05 |
| 1975 | Fleming, Greg | Seed sampler | $2.25 |
| | Smith, Earl | Seed sampler | 2.25 |
| 1976 | Gore, Robert E., Jr. | Seed sampler/weigher | $2.30 |
| | McClaughlin, Walter, II | Seed sampler | 2.30 |

A comparison of wages of these newly hired white employees with the wages of black employees in the same job assignments show that the whites were generally paid no more, and in some cases less, than blacks in the same job assignment. All such whites were paid lower wages than a number of blacks were contemporaneously earning on jobs such as solvent plant operator and prep room. (See Plaintiff's Exhibits P–2c through P–2h.)

35. Defendant's ability to place whites in every job assignment has been limited by the ·relatively small number of whites who have sought employment as general hourly workers.

36. The job assignments and wages of whites hired as general hourly employees have been made on a non-discriminatory basis.

## D. Wages and Job Assignments by Department.

## I. Solvent Plant.

37. Since the solvent plant has been in operation at Minter City Oil Mill beginning in 1972, there have been a total of 10 different employees assigned to the job of solvent plant operator, 7 blacks (Bennie Ratliff, Leon Williams, J. P. Townshend, Charlie Phillips, James Phillips, Eddie Foster, Frederick Lewis) and 3 whites (Don Kersh, Ste-

**44**

ven Dugger, David McLaughlin). All of these employees were paid the same or comparable wages. (Defendant's Exhibit D–1.)

38. In every year since 1972, one or more blacks have received the highest rate of pay in the solvent plant.

| 1973 | Ratliff (B), Williams (B), Kersh (W) Dugger (W) | (All) | $2.75/hr. |
| 1974 | Ratliff (B), Williams (B), Townshend (B) Kersh (W) (Note: Williams and Townshend reached $2.90/hr. before Kersh (W) and Ratliff (B) | (All) | 2.90/hr. |
| 1975 | C. Phillips (B), Ratliff (B) | | 3.05/hr. |
| 1976 | C. Phillips (B), Ratliff (B) | | 3.25/hr. |
| 1977 | Ratliff (B) (became salaried shift foreman 9/1/77) | | 3.40/hr. |
| | J. Phillips (B) | | 3.30/hr. |

(Source: Defendant's Exhibit D–1)

39. Black employees in the solvent plant have been the highest paid hourly workers in the Mill. The black employees have generally earned more than any white hourly employee in any other department, including maintenance.

| | Blacks in Solvent Plant | | Highest White Hourly Employee (maintenance or elsewhere) | |
| --- | --- | --- | --- | --- |
| 1973 | Ratliff, Williams | $2.75 | Starnes (special lint room maintenance) | $2.25 |
| 1974 | Ratliff, Williams, Townshend | 2.90 | Bobbie Phillips (maintenance) | 2.80 |
| 1975 | C. Phillips, Ratliff | 3.05 | Carithers, Yates, Ward (maintenance) | 2.75 |
| 1976 | C. Phillips, Ratliff | 3.25 | Starnes (special lint room maintenance) | 3.25 |

(Plaintiff's Exhibit P–2)

40. There has been no racial discrimination against blacks in regard to job assignments or wages in the solvent plant which is generally the highest paid hourly department in the Mill.

II. *Maintenance.*

41. Plaintiff has claimed discrimination against blacks in regard to the maintenance department. This department is a very small department which has never contained more than either one, two, or three, employees at any one time. (Plaintiff's Exhibit P–2, sheets for maintenance department.)

42. Although most of the persons employed in the maintenance department have been white, Bennie Ratliff, a black who had been working in the solvent plant, did in fact work in maintenance during the fall of 1974. While Ratliff was working in maintenance, he continued to be paid at his solvent plant wages ($2.90) which was higher than the wages of any white hourly maintenance man in 1974. Ratliff's return to the solvent plant was necessitated by Leon Williams' termination in December, 1974. (Plaintiff's Exhibit P–2d, 1974 charts for solvent plant and maintenance.)

43. The position of maintenance generally commands higher wages than other job classifications due to the required skills and required knowledge by the employee of the involved machinery, welding procedures, and general mechanical knowledge.

44. The Mill has had great difficulty in hiring qualified maintenance workers, either black or white. Presently most maintenance work at Minter City Oil Mill is done by employees sent from the Greenwood plant or outside contractors.

45. In 1974, 1975, and 1976, the Mill did hire several maintenance employees. Basically these men were hired one at a time seeking to find one suitable assistant for the maintenance supervisor Carl Noah. Each man hired had qualifications, skills, or relevant experience in maintenance which indicated that he might make a suitable maintenance employee (e. g., Allen Bennett and W. E. Broyles, Jr., experienced welders; Bobbie Phillips, plumber and welder).

46. Plaintiff has suggested that there was racial discrimination involved in the fact that helper Willie Stockton was not given the job title maintenance man or paid at the same rate as maintenance department employees. Stockton has served as a helper to the shift foreman on the night shift, but he has not performed, and is not qualified to perform, the same duties as employees in the maintenance department, who are required to have some background knowledge of welding and machinery repair, and must have the ability to read and understand parts manuals, assembly manuals, and blueprints.

47. Defendant's hiring for its maintenance department, which involves only one or two job positions at any one time, has not been racially discriminatory against blacks, especially including Willie Stockton.

III. *Lint Room.*

48. Plaintiff has claimed racial discrimination in regard to hourly wages paid to Mack Morgan, black lint room operator, and Henry Starnes, a white who has worked for Minter City Oil Mill during portions of 1973, 1976 and 1977.

49. Henry Starnes was employed during the spring and summer of 1973, 1976 and 1977, for the purpose of reworking lint room equipment which had been damaged or worn during the busiest part of the Mill season. He made repairs and overhauled equipment which was beyond the capability of regular lint room employees and which would have otherwise required the time and skill of the superintendent or plant manager. He did not have the same duties as a regular lint room employee and should more properly have been classified as a maintenance specialist.

50. Starnes is one of the most experienced ginners in the mid-south area and the Minter City Oil Mill was able to obtain his services at the relatively low (for Starnes) wages paid only because he lived near the Mill and did not want to travel extensively during the off-ginning season.

51. Starnes could obtain a high price for his specialized services. For example, in 1977 Starnes worked at the Mill only a few weeks and was hired away by a Tennessee ginning company who paid him $6.00 an hour, which wages the Mill could not afford to pay.

52. The difference between the wage rates of Mack Morgan and other lint room employees and Henry Starnes is justified by the difference in their job duties and skills. This difference in wages is not based on race.

IV. *Shift Foremen.*

53. Since 1971, a total of 8 persons have served as shift foremen at the Minter City Oil Mill. Four, A. D. Magee, Charlie Phillips, Bennie Ratliff, and Wilbert Hughes (who served as a shift foreman on a trial basis in 1975) have been black. (Defendant's Exhibit D–2)

54. At the present time there are 3 shift foremen, Charlie Phillips (B), Bennie Ratliff (B), and Charlie Goss (W).

55. All of these shift foremen work on a monthly salary. As of September 1977, all received the same pay.

56. All shift foremen, regardless of race, do substantially the same work and work approximately the same hours. Shift foremen now work on a rotating basis so that no shift foreman is permanently assigned to one shift. Prior to the retirement of A. D.

Magee in 1975, all shift foremen then worked approximately the same number of hours. However, at that time each foreman had a particular shift. A. D. Magee supervised the night shift on which there were fewer employees and few complicated tasks, such as maintenance, to supervise.

57. The only difference among shift foremen over the years has been that prior to June 1, 1977, those blacks who had served as shift foremen, Magee, Phillips, Ratliff, and Hughes (trial basis) had been paid on an hourly rate (straight time plus time-and-one-half for overtime) while most white shift foremen had been paid on a monthly salary. (Exceptions are Don Kersh who began work as shift foreman in 1974 on an hourly rate and Allen Bennett who began work in 1975 at an hourly rate.) (Defendant's Exhibit D–2).

58. Blacks had been offered a salaried pay arrangement as shift foremen in 1975 but had declined the offer.

59. The fact that certain black shift foremen were paid on an hourly rate, rather than a monthly salary, does not show discrimination against them in the area of compensation. In fact, on the basis of total earnings, hourly paid shift foremen have consistently earned nearly as much or in many cases more than salaried shift foremen. For example, in 1974 A. D. Magee had total earnings of $8,355.58 which exceeded the annual earnings of any white shift foreman.

In 1975 A. D. Magee retired after working 3 months during which he earned $2,506.53 or a monthly rate of $835.51, which is over $100 per month more than the highest monthly salary paid to any white supervisor in 1975.

In 1977 when Charlie Phillips worked part of the year at an hourly rate and part of the year on salary, he made $11,450.61 or $1,000.00 more than Charlie Goss who was on salary throughout the year. (Since after June 1, 1977, Phillips and Goss were paid the same salary, the favorable difference must have arisen during the period when Phillips was on an hourly rate.)

When monthly salaries are converted to an hourly rate, the lack of discrimination against hourly paid shift foremen is apparent. For example, the $775 paid to Bennett and Goss in 1976 and 1977 (through June 1st) converts to a weekly rate of $178.84 ($775 × 12 = $9,300 divided by 52). Assuming at least 48 hours per week (the testimony indicates shift foremen were actually required to work up to 60 hours or more), $178.84 converts to an hourly rate of $3.44 (40 hours at $3.44; 8 hours at $5.16). This compares very favorably with the hourly rate of Charlie Phillips, $3.50/hour in 1976 and $3.65/hour in 1977. (Defendant's Exhibit D–2.)

60. One of the reasons why the Mill management placed all shift foremen on fixed salary was that on an hourly rate, shift foremen could make more, not less, than on a salary. This was presumably one of the factors which made Phillips, Ratliff and others reluctant to change over previously.

61. There is no basis for a finding of racial discrimination in regard to income against any black shift foreman due to the now-eliminated differences between salaried and hourly pay of shift foremen.

V. *Salaried Positions, Generally.*

62. Since March 1, 1973, the date on which W. P. Hayne was employed as manager of the Mill, there have been no occasions on which new employees were hired in from the outside into monthly salaried jobs. (Defendant's Exhibit No. 4.)

63. There is no evidence that any black person has applied for a salaried job when there was a job vacancy.

64. Since March 1, 1973, there have been five employees at the Minter City Oil Mill who have been converted from hourly wages to monthly salary. Three of these (Don Kersh and Allen Bennett, Shift Foremen, and Leroy Tubbs, Quality Control Supervisor) have been white, while two (Bennie Ratliff and Charlie Phillips) have been black. (Defendant's Exhibit D–4.)

65. Since March 1, 1973, there have been no job openings in the following positions: manager, assistant manager, superintendent, assistant superintendent, secretaries, and bookkeeper.

66. Plaintiff has failed to prove by a preponderance of the evidence that there has been racial discrimination, within a relevant time frame, against blacks in the hiring or promotion to vacancies in salaried positions.

E. *Benefits of Employment.*

67. The evidence is undisputed that all of the employees of the Minter City Oil Mill have historically received the same benefits of the pension plan and all insurance programs.

68. Prior to 1974, there was no uniform policy regarding vacation privileges. Beginning in 1974, plant manager Hayne implemented a firm policy of one week paid vacation for all hourly wage employees who had been employed for at least one year and two weeks paid vacation for all monthly salaried employees who had been employed for at least one year.

69. Allowing monthly salaried employees two weeks paid vacation is justified on the basis that these employees are subject to call and frequently work overtime without additional pay.

70. The new vacation policy has been applied uniformly since 1974 without regard to race. For example, the 1974 time cards of hourly employees J. P. Townshend (B), Leon Williams (B), Steve Dugger (W), and Donald Kersh (W) who were all hourly employees in the solvent plant show that each received one week paid vacation. (Defendant's Collective Exhibit 6). On the other hand, Bennie Ratliff, black salaried employee, has received two weeks paid vacation.

71. In regard to the vacation situation prior to 1974, the evidence established that salaried employees, all of whom were white, received vacation pay, while hourly paid employees, the great majority of whom were black, did not receive vacation pay. Such arrangement on the part of management, discriminated against black hourly employees in the area of vacation benefits.

F. *Chances in Management and Ownership.*

72. Management practices at the Minter City Mill began to change in March, 1973, when W. P. Hayne was brought in as manager. In September, 1975, the Yazoo Valley Oil Mill took over the Minter City Mill on a management contract and in 1976, the Yazoo Valley Oil Mill acquired the Minter City Mill in a merger by which former owners of the Minter City Mill became minority owners in the merged corporation.

73. Changes in management and ownership occurred after Williams was terminated.

74. Recent progressive changes in management are an important factor to be considered in regard to a finding of discrimination. *Swint v. Pullman-Standard*, 539 F.2d 77, 104 (5th Cir. 1976).

G. *Limitations.*

75. This litigation arises out of Charge No. TJA 5–0768, filed by Plaintiff Williams on or about January 23, 1975. Two years prior to that date is January 23, 1973, which would be the maximum statute of limitation of recovery of monetary damages in the nature of back pay. (EEOC Charge attached to Complaint; 42 U.S.C. § 2000e–5(g)).

76. The complaint in this civil action was filed May 17, 1976. Three years prior to that date is May 17, 1973, which would be a maximum statute of limitations for recovery of monetary damages under 42 U.S.C. § 1981 or § 1982, by operation of the adopted Mississippi statute of limitations on unwritten contracts. (Miss.Code Ann. § 15–1–29 (Cumm.Supp.1978.))

H. *Housing.*

77. For many years the company has operated an oil mill at Minter City, Mississippi, which is the principal and only substantial industry in this unincorporated village. As a part of the inducement for

48

people to be employed at the mill the company has offered housing for their employees. The company maintained this housing for the benefit, convenience and use of its employees. This housing was segregated on the basis of race. Housing for whites was suitable, convenient and adequate, whereas housing provided blacks was inferior and not a decent place for people to live. Blacks paid considerably higher rents than whites. After a hearing on plaintiffs' motion for a preliminary injunction, the court, on May 30, 1977, ordered defendant to reduce rentals in the houses rented to black employees to $2.50 per week and gave Defendant the option of terminating its ownership of rental houses within six months.

78. The parties have reported to the court that defendant has promptly and completely complied with the court's requirements and has destroyed or given away all of the rental houses in question. The discrimination on housing issue is therefore rendered moot, except for allowance to members of the class of damages to compensate them for the excessive rent charged prior to the effective date of the court's May 30, 1977, order.

## CONCLUSIONS OF LAW

A. *Jurisdiction.*

1. The court has jurisdiction of this case under 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981, 42 U.S.C. § 1982 and 28 U.S.C. § 1343.

2. Plaintiff Leon Williams is a black citizen of the United States. He has timely and properly filed a charge of discrimination with the Equal Employment Opportunity Commission and received from the commission a right-to-sue letter. He has standing to assert claims under the aforementioned Civil Rights Act.

3. Defendant Yazoo Valley Minter City Oil Mill is the successor to the Minter City Oil Mill, which employed Leon Williams prior to December 20, 1974. The defendant acquired the Minter City Oil Mill by merger in 1976.

B. *Burden of Proof.*

4. The plaintiff in a Title VII case bears the burden of making out a prima facie case on each aspect of his claim of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973); *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 575, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957, 966 (1978).

5. Furthermore, the burden of making a prima facie showing must not be equated with plaintiff's ultimate burden of proving by a preponderance of the evidence that the defendant has discriminated against particular blacks on the grounds of their race. In order to respond to a prima facie showing, the employer must only "articulate some legitimate non-discriminatory reason" for challenged action or policy; whereupon the ultimate burden is upon plaintiff to show, by a preponderance of the evidence, the racial motivation or discriminatory animus, behind the employment decision. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957, 968 (1978).

6. In regard to a discharge, in order to make a prima facie case, the plaintiff must show (1) that he is a member of a protected minority group, (2) that he was discharged and (3) that he was subjected to the adverse action because of his race, that is he was treated differently from the way other employees of a different race had been treated under like circumstances. If plaintiff makes such a showing, then the defendant employer must articulate a legitimate, nondiscriminatory reason for the discharge. "[T]he plaintiff then has the burden of proving by a preponderance [of the evidence] that the employer's articulated reason was a pretext for discrimination." *Turner v. Texas Instruments, Inc.*, 555 F.2d 1251, 1256 (5th Cir. 1977); *Garrett v. Mobil Oil Corp.*, 531 F.2d 892 (8th Cir. 1976). This procedure has been applied by the Courts of this Circuit in numerous "discharge" cases. *Peters v. Jefferson Chemical Co.*, 516 F.2d 447 (5th Cir. 1975); *Bolton v. Murray En-*

*velope Corporation*, 493 F.2d 191, 193–94 (5th Cir. 1974); *Smith v. Universal Services, Inc.*, 454 F.2d 154 (5th Cir. 1972); *Markey v. Tenneco Oil Co.*, 439 F.Supp. 219, 223–224 (E.D.La.1977); *Hardin v. Thiokol Corp.*, 435 F.Supp. 1191 (W.D.La.1977).

■ 7. Whether or not the employer has good cause to terminate an employee is not an issue in an employment discrimination case. Even if the employee is discharged unnecessarily or in error, the employer is not guilty of racial discrimination, unless plaintiff proves that he was treated differently on account of his race from other employees with the same work history, committing the same type infraction. *Turner v. Texas Instruments, Inc.*, 555 F.2d 1251, 1256–57 (5th Cir. 1977).

C. *Williams' Individual Claim.*

■ 8. Leon Williams has not made a prima facie showing that his discharge on December 20, 1974, was based on his race: (a) he has not shown that there was any white solvent plant operator who had performed his job in a similar manner and behaved in the same manner toward supervision and who was not terminated, and (b) defendant did not replace Williams with a white or hold the job open, but rather replaced him as solvent plant operator with Bennie Ratliff, a black person.

■ 9. Even if Williams had made a prima facie showing, defendant has shown that there were legitimate, non-discriminatory business reasons for Williams' termination including his violation of work rules regarding immediately notifying the shift foreman of problems in the solvent plant, shutting down the solvent plant on the basis of his judgment decision without contacting the shift foreman, absence from his work station and interference with the other employees during working hours and his insubordinate attitude toward supervision and correction. *Furnco Construction Corp. v. Waters, supra; Turner v. Texas Instruments, Inc., supra.*

10. Williams has not shown by a preponderance of the evidence that the reasons given for his discharge were a pretext to conceal racial motivation. *Furnco Construction Corp. v. Waters, supra; Turner v. Texas Instruments, Inc., supra.*

11. Plaintiff Williams' individual claim against defendant that he was discharged on account of his race is, therefore, dismissed.

D. *Hiring, Job Assignments and Wages.*

■ 12. Plaintiff has not proven that defendant's hiring practices have discriminated against black persons. In fact, the defendant has hired a preponderance of black employees. There is no evidence that the defendant has failed to hire a black applicant for a job vacancy and has subsequently hired a white person for that vacancy. *Cf. McDonnell Douglas Corp. v. Green, supra.*

13. Defendant's practice of relying, in part, on referrals from existing employees has not discriminated against blacks due to the predominance of blacks among existing employees and the fact that there has been no adverse impact on black employment. *Taylor v. Safeway Stores, Inc.*, 524 F.2d 263, 271–72 (10th Cir. 1975).

■ 14. The Civil Rights Acts do not require that every department mirror work force as a whole. *See Teamsters v. United States*, 431 U.S. 324, 339 n. 20, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396, 418 (1977); or that every department contain a racial mixture, especially if the absence of whites in certain jobs is a result of unavailability of white employees and the resultant hiring of numerous black employees. *See United States v. Jacksonville Terminal Company*, 451 F.2d 418, 443–448 (5th Cir. 1971), *cert. denied*, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972); *Roman v. ESB, Inc.*, 550 F.2d 1343, 1353 (4th Cir. 1976).

■ 15. Defendant's job assignments for general hourly employees have not violated the Civil Rights Acts in that the evidence shows that (a) overwhelming preponderance of persons seeking employment and persons hired by defendant are black; (b) those whites who have been hired for gen-

eral hourly positions have been assigned, along with blacks, to manual job classifications including yard worker, sampler/tow motor, seed weigher and helper; (c) wages of such whites have generally been the same as, and in some cases less than, the wages of blacks in the same or similar job assignments; (d) Defendant's ability to place whites in every job classification has been limited by the relatively small number of whites who have sought employment as general hourly workers; and (e) blacks have not been restricted to the lowest hourly positions, as evidenced by the predominance of blacks in higher paid hourly job classifications such as prep room and solvent plant, which is the highest paid hourly position in defendant's plant.

### (i) *Solvent Plant.*

16. There is no evidence that blacks have been discriminated against in any way in connection with the solvent plant. To the contrary, the evidence shows that (a) the blacks have made up the majority of all solvent plant operators, (7 blacks out of 10 employees who have ever held this position); (b) black plant operators have been paid as much as, and in many cases more than, white solvent plant operators and (c) solvent plant operators are generally the highest paid non-supervisory workers in defendant's entire mill.

### (ii) *Maintenance Department.*

■ 17. Defendant has failed to prove that defendant has discriminated against blacks in regard to its maintenance department in that the evidence shows that (a) at least one black person has been assigned to this department (i. e., Bennie Ratliff); (b) wages paid to maintenance workers, although higher than those in other job classifications due to required skill and knowledge, are less than wages paid to blacks in such positions as solvent plant operators; (c) in hiring maintenance employees, defendant has hired individuals with qualifications, skills or relevant experience in maintenance; and (d) there is no evidence that any blacks qualified to do maintenance work in defendant's mill actually sought a position in the maintenance department when there was a job vacant. Cf. *McDonnell Douglas Corporation v. Green, supra.*

18. Defendant does not have any specific tests or job requirements for its maintenance employees. However, common sense and the evidence before the court shows that there are some requirements for a maintenance employee, including ability to read and write, to understand parts and assembly manuals, and similar requirements which are "so manifestly job-related" so as to be beyond the necessity of proof. *Smith v. Olin Chemical Corp.*, 555 F.2d 1283, 1287–88 (5th Cir. 1977 en banc). There is no evidence of racial discrimination in the fact that "helpers", especially Willie Stockton, have not been given the title of maintenance men or that they are not paid the same rate as maintenance department employees, because the evidence is clear that such helpers lack the "manifestly job-related" minimal qualifications for maintenance department employees.

### (iii) *Lint Room.*

■ 19. Regardless of the race of the persons involved, there is no discrimination in hiring a person with particular abilities for a special job and paying that individual wages commensurate with his special qualifications and duties which are not common to other employees. Such as the situation involves different pay for different work, rather than different pay for the same work. *Bradford v. Sloan Paper Company, Inc.*, 383 F.Supp. 1157, 1160 (N.D.Ala.1974) (hiring of Ramey as assistant manager). The hiring of Henry Starnes during parts of 1973, 1976 and 1977 as a special maintenance man to repair and overhaul lint room equipment, at a higher rate of pay than regular lint room employees, does not constitute proof of racial discrimination, since the difference in wage rates of Mack Morgan and other lint room employees and Henry Starnes was justified by the difference in their job duties and skills.

(iv) *Limited Number of Jobs Involved.*

20. The impact, if any, among black workers of the defendant's employment practices in regard to the maintenance department (or Henry Starnes in the lint room) has been minimal since these practices involve only a very small number of positions (i. e. one position at a time as an hourly maintenance assistant; in the lint room Starnes only worked for parts of three years). No substantial inference of discrimination can be drawn from such small numbers of employment decisions. *Adams v. Reed,* 567 F.2d 1283, 1287 (5th Cir. 1978); *Turner v. Texas Instruments, Inc.,* 555 F.2d 1251, 1257 (5th Cir. 1977); *Ochoa v. Monsanto Company,* 473 F.2d 318, 320 (5th Cir. 1973); *Neely v. City of Grenada,* 438 F.Supp. 390, 409 (N.D.Miss.1977); see *Teamsters v. United States,* 431 U.S. 324, 339 n.20, 97 S.Ct. 1843, 52 L.Ed. 2d 396 (1977). Furthermore, defendant's liability in regard to the subject positions is limited to actual job vacancies (which would amount to not more than one hourly assistant position in maintenance and one special lint room maintenance employee during portions of 1973, 1976 and 1977). *Swint v. Pullman-Standard,* 539 F.2d 77, 103 (5th Cir. 1976); *Bing v. Roadway Express, Inc.,* 485 F.2d 441, 452 (5th Cir. 1973).

(v) *Shift Foremen.*

21. The evidence does not support any inference of racial discrimination in promotion of hourly employees to shift foreman in that (a) since 1971, a total of 8 persons have served as shift foremen, 4 of whom were black and 4 of whom were white; (b) at the present time there are three shift foremen, 2 of whom are black and 1 of whom is white; (c) all shift foremen presently work on a monthly salary, and, as of September 1977, made the same monthly wage of $815.00; and (d) all shift foremen regardless of race, do substantially the same work and work approximately the same hours.

22. The evidence that prior to June 1, 1977, those blacks who had served as shift foremen had been paid at an hourly rate while most white shift foremen (with at least one exception) had been paid on a monthly salary, does not prove racial discrimination against the black shift foreman involved for the following reasons: (a) all shift foremen, regardless of race, did substantially the same work and worked approximately the same number of hours; (b) in return for their work, the black shift foreman and the white shift foreman, regardless of their method of pay, received substantially the same actual earnings. In fact, in a number of years, the highest paid shift foremen were those working on an hourly rate rather than a monthly salary. When these monthly salaries are converted to an hourly rate, the monthly salary compares very equally with hourly rates paid to shift foremen who were working on a hourly basis. In any event, the difference between actual earnings of shift foremen working on hourly rates and on monthly salaries, appears to be random and does not appear to correspond to racial lines; (c) as early as 1975, defendant had offered black shift foremen the opportunity to work on a monthly salary which offers were rejected by the employees; and (d) the evidence presented by defendant (especially Defendant's Exhibit "D-2") is statistically fair evidence that the now-eliminated differences between salaried and hourly pay of shift foremen did not result in systematic or discriminatory economic loss to blacks. *United States v. United States Steel Corporation,* 520 F.2d 1043, 1054 (5th Cir. 1975).

(vi) *Vacation Policy.*

23. Defendant's vacation policy since 1974 of one week paid vacation for all hourly wage employees who have been employed for at least one year and two weeks paid vacation for all monthly salaried employees who have been employed for at least one year has been applied uniformly without regard to race and does not violate the Civil Rights Acts.

24. In regard to vacation benefits prior to 1974, the vacation policy followed by defendant discriminated against the hourly paid employees of the mill, the great major-

ity of whom were black. Salaried employees, all of whom were white, received paid vacations, and hourly paid employees, the great majority of whom were black, did not. The defendant discriminated against the black hourly paid employees because of the race. White hourly employees were few in number. The court finds that the discrimination was imposed upon a group of virtually all black employees. That there were a few white employees in the group is of no consequence.

(vii) *All Other Employment Policies and Practices.*

25. In regard to all other employment policies and practices, except those specifically referenced in the proceeding Conclusions of Law, plaintiff has failed to produce any evidence of racial discrimination. Therefore, the court finds that plaintiff has failed to meet his burden of proof in regard to such policies or practices and the court finds that defendant shall not be liable to plaintiff or any member of the class which he represents in connection with any other type of employment policy or practice. Plaintiff's complaint insofar as it alleges discrimination in regard to other employment policies or practices is dismissed.

E.  *Progressive Changes.*

26. Recent progressive improvements are highly relevant in determining whether the employer is currently discriminating against black persons. Such improvements can counterbalance evidence of old historical conditions. *Swint v. Pullman-Standard,* 539 F.2d 77, 104 (5th Cir. 1976).

27. Declaratory and injunctive relief are inappropriate in a Title VII action where the evidence shows that defendant has abandoned previous employment practices, and indicates its intention to comply with all relevant Civil Rights Acts requirements in the future. *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 244 (5th Cir. 1974); *Parham v. Southwestern Bell Telephone Co.,* 433 F.2d 421, 429 (8th Cir. 1970).

28. Evidence in this case that the ownership and management of the defendant Oil Mill has materially changed since Leon Williams' discharge, that certain practices which may have been suspect in the past (such as the absence of a uniform vacation policy, hourly vs. monthly pay for shift foremen, non-rotating shifts for shift foremen, have been wholly abandoned, that black employment in supervisory positions has increased, and that the current management has sought to eliminate any vestiges of policies of the old management which are the source of plaintiff and class members' principal complaints serves to:

(a) counterbalance evidence of discrimination based on historical conditions, so as to negate any inference of current discrimination;

(b) make injunctive relief inappropriate; and

(c) mitigate against punitive damages against current management.

F.  *Punitive Damages.*

29. Punitive damages cannot be awarded under Title VII, 42 U.S.C. § 2000e, et seq., *Pearson v. Western Electric Co.,* 542 F.2d 1150, 1151–53 (10th Cir. 1976); *EEOC v. Detroit Edison Co.,* 515 U.S. 301, 308–310 (6th Cir. 1975), *vacated on other grounds,* 431 U.S. 951, 97 S.Ct. 2668, 2669, 53 L.Ed.2d 267 (1977); *Heath v. D. H. Baldwin Company,* 447 F.Supp. 495, 505 (N.D.Miss.1977).

30. Punitive and compensatory damages may be available under 42 U.S.C. §§ 1981 and 1982, *Johnson v. Railway Express Agency,* 421 U.S. 454, 460, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). However, when such damages have been considered proper in a combination, 42 U.S.C. § 1981 (employment) and § 1982 (housing) action, compensatory damages have been limited to actual lost earnings. *Faraca v. Clements,* 506 F.2d 956, 959–60 (5th Cir. 1975); *see also Johnson v. Goodyear Tire & Rubber Co.,* 491 F.2d 1364, 1378–79 (5th Cir. 1974) (uniformity in the award of compensatory damages under Title VII and the earlier Civil Rights Acts is necessary.) Furthermore, punitive damages are disfavored by

the law and "are to be allowed only with caution and within narrow limits." *Lee v. Southern Homes Sites Corp.*, 429 F.2d 290, 294 (5th Cir. 1970). An award of punitive damages can be made only where defendant's conduct has been wanton and malicious, in gross disregard of the rights of others or in bad faith, and is necessary to punish the defendant. *Milton v. Bell Laboratories, Inc.*, 428 F.Supp. 502, 515 (D.N.J. 1977); *see Lee v. Southern Home Sites Corp., supra.* There is also support for the proposition that, while back wages can be awarded as part of the equitable relief in a Civil Rights Action under 42 U.S.C. § 1981 and § 1982, *Williams v. Travenol Laboratories, Inc.*, 344 F.Supp. 163 (N.D.Miss.1972), there is a right to jury trial on punitive and compensatory damages. *Miller v. Doctor's General Hospital*, 76 F.R.D. 136, 142 (W.D. Okl.1977); cf. *Lynch .v. Pan American World Airways, Inc.*, 475 F.2d 764, 765 (5th Cir. 1973) (denying jury trial where allegations of compensatory and punitive damages were frivolous and unsupported).

31. This case is not a proper case for punitive damages in regard to either § 1981 or § 1982, in that (a) Defendant has not acted wantonly, maliciously, or in bad faith, (b) Defendant has demonstrated a willingness to change unprogressive policies of former management (which process has been going on both before and after the present litigation), and (c) such damages are not required to force defendant to change its policies. The decision not to award punitive damages is reinforced by the substantial change in ownership and management. Punitive damages are not awarded to enrich the plaintiff, but as a punishment against a wrong doer, and therefore may not be exacted against persons who have not participated in the wrong, 25 C.J.S. *Damages* § 125(1); *Amos v. Prom*, 115 F.Supp. 127, 134 (N.D.Iowa 1953) (decision under Iowa Civil Rights Act). An award of punitive damages against the current ownership (a majority of whom were not connected with this Mill until two years ago) based on conditions and practices which largely antedate the change in management and ownership would serve as a deterrent, not to violators of the Civil Rights Act, but to buyers who are willing to take over and modernize unprogressive industries.

### G. Statutes of Limitations.

32. The maximum period for recovery of monetary damages in the nature of back pay, under Title VII by plaintiff or any other class member, is January 23, 1975, or two years prior to the filing of the EEOC charge on January 23, 1975. 42 U.S.C. § 2000e–5(g).

33. The maximum period of recovery of monetary damages for back wages or other damages under the Civil Rights "equal right to contract" statutes, 42 U.S.C. § 1981 or § 1982, is May 17, 1973, three years prior to the filing of this suit, by operation of the adopted Mississippi statute of limitations on unwritten contracts which controls the maximum period for recovery of monetary damages. *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1379 n. 49 (5th Cir. 1974); *Walton v. Utility Products, Inc.*, 424 F.Supp. 1145, 1147 (N.D. Miss.1976); Miss.Code Ann. § 15–1–29. (Cum.Supp.1978).

34. In regard to any practice which is found by the court to involve racial discrimination, but which has been terminated, no damages can be recovered since the date of its termination. *Pettway v. American Cast Iron Pipe Company*, 494 F.2d 211, 258 (5th Cir. 1974).

### H. Dismissal of Plaintiff's Miscellaneous Causes of Action.

35. Plaintiff's claims based on the Fifth, Ninth and Fourteenth Amendments to the United States Constitution are dismissed since plaintiff has failed to plead or prove that defendant's action amount to "state action" required for violation of these constitutional amendments. *Lloyd Corp. v. Tanner*, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972); *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); *Civil Rights Cases*, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883); *Greco v. Or-*

*ange Memorial Hospital Corp.*, 513 F.2d 873 (5th Cir.) *cert. denied* 423 U.S. 1000, 96 S.Ct. 433, 46 L.Ed.2d 376 (1975); *Heath v. D. H. Baldwin Co.*, 447 F.Supp. 505, 509 (N.D. Miss.1977); *Walton v. Utility Products Co.*, 424 F.Supp. 1145, 1148 (N.D.Miss.1976).

██ 36. Similarly, plaintiff has failed to prove a violation of 42 U.S.C. § 1983 since plaintiff has not shown that defendant has acted under "color of law" (which amounts to state action), as required by § 1983. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Greco v. Orange Memorial Hospital Corp.*, 513 F.2d 873 (5th Cir.) *cert. denied* 423 U.S. 1000, 96 S.Ct. 433, 46 L.Ed.2d 376 (1975).

██ 37. The Thirteenth Amendment is not addressed solely to governmental action. However, private conduct which constitutes a violation of the Thirteenth Amendment must be such as subjects the victim to "involuntary servitude . . . [or] compulsory labor". Plaintiff has failed to plead or prove practices constituting a violation of the Thirteenth Amendment and plaintiff's claims based on this Amendment are dismissed. *United States v. Shackney*, 333 F.2d 475, 485 (2nd Cir. 1964); *Heath v. D. H. Baldwin Company*, 447 F.Supp. 505, 509 (N.D.Miss.1977); *Walton v. Utility Products Company*, 424 F.Supp. 1145, 1148 (N.D.Miss.1976).

I. *Housing Issue.*

██ 38. On May 19, 1977, the court ordered that defendant either cease to rent housing in Minter City or to equalize all houses. The defendant chose to give away or destroy its rental units. The court finds that this action renders the housing issue moot, except as to the award of damages to discriminatees in the housing area. Class members renting housing from defendant during the period May 17, 1973 to May 19, 1977, are entitled to recover rental paid in excess of $2.50 per week for the period.

J. *Attorney's Fees.*

██ 39. The circumstances of this case necessitate the allowance of a reasonable

attorney's fee and expenses as a part of the costs. 42 U.S.C.A. § 1988 (Supplementary Pamphlet, 1974 to 1977).

### *SUMMARY*

The parties will confer and stipulate as far as possible from a review of the defendant's records, the members of the class entitled to awards pursuant to the findings herein made, and the amount of the same.

The allowance of an attorney's fee and reimbursement for expenses incurred by plaintiff shall await the entry of a final judgment.