Charles CUMMINGS and Herman Brown, Plaintiffs,

v.

RETZER & RETZER, INC., et al., Defendants.

Leonard HUDSON, Plaintiff,

v.

RETZER & RETZER, INC., et al., Defendants.

Civ. A. Nos. GC 83–16–GD–O, GC 84–264–GD–O.

United States District Court, N.D. Mississippi, Greenville Division.

Oct. 14, 1986.

Willie Griffin (LEAD) Charles Victor McTeer, McTeer & Bailey, P.A., Greenville, Miss., for plaintiffs.

Jerome C. Hafter, W. Wayne Drinkwater, Lake, Tindall, Hunger & Thackston, Greenville, for defendants.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

The plaintiffs Charles Cummings and Herman Brown bring this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* and 42 U.S.C. § 1981. Plaintiff Leonard Hudson, having failed to comply with all jurisdictional prerequisites for an action under Title VII, brings his action only under 42 U.S.C. § 1981. The plaintiffs are all former employees of a McDonald's store in Greenville, Mississippi owned by Retzer & Retzer, Inc. Retzer & Retzer terminated Charles Cummings and Herman Brown from their employment with McDonald's and demoted Leonard Hudson. Rather than accepting the demotion, Hudson resigned and alleges, consequently, that he was constructively discharged. The court, having heard this matter without a jury, hereby records its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### Findings of Fact

To bolster their claims of discrimination, the plaintiffs offered into evidence the testimony of a number of witnesses, as well as the plaintiffs' own testimony, to the effect that Retzer & Retzer has engaged in a number of discriminatory acts and practices with regard to many of its black employees. The plaintiffs' witnesses testified as to less favorable hours for black employees, management's sending home of black employees against their will because of a racial imbalance in the work force, the relegating of black employees to maintenance positions and work in the grill area of McDonald's, the throwing away of applications from prospective black employees, preferential hiring of white employees over black employees, discrimination against blacks with regard to raises and salary, and the alleged preference of white employees over black employees for cashier positions. Much of the testimony to this effect came from McDonald's disgruntled black employees as well as several white employees who were terminated from employment with Retzer & Retzer. However, one of the plaintiffs' witnesses, Fred Atkins, a former black assistant manager in the Greenville, Mississippi store, testified on cross-examination that he had not witnessed any general discrimination directed at blacks from the time he worked as a crew person from June 1974 until he left employment with McDonalds in 1984. Atkins specifically testified that he observed no discriminatory scheduling of employees by the floor manager at that time, Doug Delap, and that he checked behind Delap to see if the hours of black employees were cut. Atkins also testified that those employees who worked late at night did so voluntarily so as to increase the amount of their pay checks or because the employees expressed a willingness to work weekends or late at night when they filled out their job availability hours. Atkins further testified that he never saw anyone sent home against their will because of a supposed racial imbalance existing on any particular shift but that if too many employees of one color were working during a shift, it was common to ask of the employees whether any of them desired to go home early. As to the placement of employees, Atkins testified that some employees prefer to work in the grill area, that maintenance positions paid more than regular crew positions and that neither the grill nor maintenance positions were assigned to blacks because the jobs were considered too dirty for white employees. Rather, Atkins stated that both blacks and whites were sent out to clean up parking lots, empty trash and clean the lobby. Atkins also testified that he never saw applications thrown away and was never told to only hire whites. He further testified that the store manager, Doug Delap, and the store supervisor, Don Fitzgerald, did not attempt to discourage blacks from applying or continuing employment with McDonald's and that he personally saw Doug Delap hire a great number of blacks.

Atkins' testimony is borne out by the exhibits admitted at trial. On the employment applications, employees are requested to provide their job availability as to the

total number of hours available per week and the particular hours they would be available on each day of the week. As the defendants' witnesses testified, management complied with the employees' availability and this determined the hours the employee would be scheduled to work. (See defendant's exhibit 45). Secondly, a compilation of the hourly employees hired at the Greenville store from January 1, 1981 shows a total of 228 employees hired. Of these, 97 were black, 122 were white and 9 were of an unknown race. (Defendant's exhibit 41). Defendant's exhibit 43 indicates that the average income of blacks for the year 1981 was $4,815.31 while the average income of whites was $4,670.10. In 1982, the black employees' average income was $5,577.24 while the white employees' average income was $3,441.08. Unfortunately, defendant's exhibits 43 and 44 failed to take into consideration the number of hours worked by the employees. However, plaintiff's exhibit 21 effectively demonstrates that, regardless of race, those individuals hired as crew members in 1982 all received a starting salary of $3.35. Of those individuals hired in 1981, all employees again received a starting salary of $3.35. Likewise, for those employees hired in 1980, the starting salary, regardless of race, was $3.10. In 1979, only one individual was hired at the rate of $2.90 per hour and both individuals hired in 1978 were hired at the same salary of $2.65 per hour. In 1977, one individual was hired at a starting salary of $2.30 per hour. The only discrepancies with regard to starting salaries occurred in 1976 and 1974. In 1976, a white employee was hired at the rate of $2.20 per hour, a black employee at the rate of $2.30 per hour and another black employee at the rate of $2.35 per hour. In 1974, two blacks were hired at the rate of $2.40 per hour whereas another black individual was hired at $2.28 per hour. Though the exhibit again fails to take into account the number of hours worked since the date of employment, the then existing salaries of the employees since their date of hire corresponds closely to the length of employment, again without regard to race.

As to the salaries of managerial employees, Charles Haik, one of Retzer & Retzer's former store supervisors, testified that white manager trainees received around two hundred dollars more per month than black employees and that this salary difference stayed constant throughout the manager's careers. However, as demonstrated by defendants' exhibit 46, the starting salaries of white and black managers were approximately the same once the date of hire is considered. For example, though J.T. Gray, a white, received $50 more per month than a black hired about four months later, Larry Miller, a black hired on June 1, 1982 received $25 more than David Clark, a white hired on August 19, 1982. Fred Atkins, a black hired on August 21, 1982, received $25 more per month than did a white manager hired on November 11, 1982 and $50 more per month than George Lewis, a white, hired on August 30, 1983. Two managers hired in 1979, Herbert Griggs, a black, and Martha Slay, a white, both received equal starting salaries even though Griggs was hired nearly five months earlier than Slay and inflation was at a high. Also, defendants' exhibit 46 shows that the highest paid managers for the years 1980–83 were all black. The highest salaries went to Charles Cummings, one of the plaintiffs herein, in 1980 and 1981, to Arthra Long, a black, in 1982 and to Fred Atkins, a black, in 1983.

As to the hiring of managerial employees, the plaintiffs introduced an exhibit showing a total of 37 employees, 18 of whom were black and 19 of whom were white. Of these managerial employees who were hired during this period, three whites are still employed as well as three blacks.

From this evidence, the court is of the opinion that Retzer & Retzer's has not and does not discriminate generally on the basis of race. Having made this finding of fact, the court proceeds to the evidence concerning alleged acts of discrimination with respect to the three individual plaintiffs in this case, Leonard Hudson, Herman Brown and Charles Cummings.

### Leonard Hudson

Since Hudson was attending boot camp with the U.S. Army, he was unable to attend trial. Instead, his testimony was introduced into the record by way of his deposition. The defendants' witnesses, particularly Don Fitzgerald, testified that Hudson was promoted to a swing manager's position over Rocky Carnes, a white. Fitzgerald testified that there was some concern on the part of management that Hudson, at age 19, was too young for the position. However, Fitzgerald, as well as Fred Atkins and other witnesses, testified that Hudson had been an excellent crew member and it was for this reason that he received the promotion.

In his deposition, Hudson asserted that he had been discriminated against on the basis of his race by a number of acts taken by Retzer, Don Fitzgerald and Doug Delap. Specifically, Hudson stated that he had not experienced any problems at McDonald's until he was asked and refused to sign an affidavit on McDonald's behalf to the effect that McDonald's did not discriminate on the basis of race. (Hudson deposition, p. 67). However, as Hudson and all other witnesses questioned on the point conceded, Hudson's promotion to swing manager occurred after his refusal to sign the affidavit. (Hudson deposition, p. 67).

Hudson also admitted that he experienced a problem in properly calculating his deposits and filling out his cash sheets. (Hudson deposition, p. 70). Fitzgerald testified that Hudson failed to improve on his paper work in those months that he served as a swing manager as exemplified by defendants' exhibit 7H. This exhibit demonstrates that in the three month period from September 1983 through November 1983, Hudson's error percentage on his deposit sheets showed very little improvement. In September 1983, Hudson's percentage rate was 79%, followed by a 69% rate in October 1983 and a return to a 79% rate in November of the same year. All other managers' error rate decreased rather substantially in the three month period. Fitzgerald testified that records were kept for this three month period on the error rates of the managers because of a contest initiated by McDonald's to reduce the amount of errors made with respect to deposits by management employees.

Steve Brown, a white, also performed poorly, and was terminated nearly eight months after his promotion. Though Brown was afforded a longer time to improve his performance, Doug Delap testified that Brown was more mature than Hudson. Further, the testimony of Fitzgerald reflected that Brown initially performed well. Therefore, Fitzgerald stated, Retzer & Retzer was not forced to discharge Brown until quite a few months after his promotion. Fitzgerald further testified that three other McDonald managerial employees were demoted to crew positions. Of these, two were white and one was black.

Hudson, who dated a black employee, Rolundia Wilson, also complained that white managers dated white female crew members without suffering any negative consequences and that he felt discriminated against on that basis. (Hudson deposition, p. 155). However, Hudson later admitted in his deposition that, as far as he knew, no action was taken against him by McDonald's because of his dating situation. (Hudson deposition, p. 156).

Hudson also testified that he felt that he had generally been discriminated against by having his hours cut at one point; by his refusal to fire a black female crew member because her register had been short even though he and other members of the management were aware of a white female employee whose register had also been short near that point in time; that Retzer and Fitzgerald resented Hudson's placing Dorothy Lott and Lovie Patterson at the front of the store running the cash registers; and that although Hudson did give food to his girlfriend, Rolundia Wilson as a "promo", white management employees did this as well.

Fitzgerald testified that Hudson was demoted for a number of reasons. One of the major reasons was Hudson's perceived

immaturity. In support of this, testimony was elicited concerning an incident where Hudson was downstairs with his girlfriend when he should have been upstairs running the shift. Fred Atkins testified that he felt that Hudson lacked some maturity. David Clark, a former McDonald's assistant manager in the Greenville store and a white, testified that he too felt that Hudson's paperwork was "shaky" and that Hudson should have been demoted. Clark further testified that a black, Jeffrey Huddleston, replaced Hudson.

Two other reasons that McDonald's decided to demote Hudson were his deposit error rates, as described previously, and his overall lack of aptitude and lack of concern as evidenced by an examination given to him by Doug Delap. On his first attempt, Hudson got only 55% of the answers correct and on his second attempt, having being given the questions and answers, Hudson only achieved a score of 70% correct. The minimal acceptable score is 75% correct.

The last reason given by Retzer and Fitzgerald for Hudson's demotion was a statement made to Atkins that Hudson thought he knew who had taken some missing hamburger. Yet, Atkins and Fitzgerald testified that Hudson refused to tell either of them who had taken the meat, demonstrating to Fitzgerald Hudson's lack of maturity and loyalty to the company.

From the evidence presented with regard to Hudson's claim under 42 U.S.C. § 1981, the court finds the defendants' reasons for demoting Hudson to have been justifiable. Although, as Atkins testified, Hudson may have turned out to have later proved himself a worthy managerial employee, the court accepts Retzer & Retzer's opinion that Hudson, at the time of his promotion to swing manager, was too immature and unreliable as to his work performance to have served the McDonald's store competently.

## Charles Cummings

Cummings was employed by Retzer & Retzer in its Greenville, McDonald's store on February 1, 1973. Cummings was allegedly terminated, according to Michael Retzer, because of a long history of cash shortage problems and bad performance ratings. Retzer testified that a $100 shortage that occurred on Cummings' shift on July 17, 1982 was the "final straw". As shown by defendants' exhibits 7 and 8, Cummings deposited only $3,650.10 although the deposits for the drawers operated on his shift, Drawers 1A, 1B, 2A, 3A, 3B and 4A, totaled the sum of $3,750.10.[1]

Retzer and Fitzgerald, Cummings' supervisor, also testified as to other problems with Cummings' performance. Retzer noted that Cummings had been on probation from November 27, 1981 until the date of his termination on July 23, 1982, a longer period of time than any employee he could recall. Retzer also testified that a female crew employee, Mona Tutor, had once made a sexual harassment claim against Cummings and another managerial employee. The other manager, a white, had admitted guilt to the charge and was immediately terminated. Cummings denied all charges and no action was taken against him. Retzer and Fitzgerald both testified to Cummings' failure to open the Greenville store one morning until 7:30 a.m. rather than the usual opening time of 6:00 a.m. Retzer testified that he could not recall any other incident where an assistant manager had failed to timely open the store. Cummings was replaced by David Clark, a white.

The claims of discrimination by Cummings and Herman Brown, as well as, to some extent, Leonard Hudson, are based on testimony by Charles Haik, Jr., Retzer & Retzer's former white supervisor. Haik testified that in December 1980, he re-

---

1. The figures of $242.35 and $188.66 shown in defendants' exhibit 7 were not explained by the defendants nor questioned by the plaintiff. Apparently, these sums were amounts of money left in drawers not used on Cummings' shift.

On the stand, Cummings testified that he offered to pay McDonald's the amount of the shortage, admitting, in effect, the fact that the shortage had occurred on his shift.

ceived a good performance rating from Retzer but that Retzer made the comment to him that the store in Greenville was "too black" and that Retzer wanted Haik to "build a story" against a number of blacks in the Greenville store, including Brown and Cummings. Haik further testified that Retzer said if Haik did not build a case against the named individuals, Retzer would find someone else who would do so. Haik's employment with Retzer & Retzer ended in February 1981 because, according to Haik, he had refused to build a case against the six black individuals that Retzer had named.

The court, however, finds Haik's testimony to have been influenced by bias. Haik, at one time, was a member in the class action suit brought by Cummings and Brown and other black employees against McDonald's prior to the court's refusal to certify the plaintiffs as a class. Haik's testimony of general discrimination against blacks and Retzer's plan to decrease the number of blacks in the Greenville store is further discredited by the testimony of the disinterested black witness, Fred Atkins. As stated previously, Atkins testified that he observed no racial discrimination. Atkins stated that he was never told to hire whites only, that Doug Delap, the store manager when Cummings and Brown were terminated, hired a great number of blacks and that neither Delap nor Fitzgerald tried to run blacks out of their jobs with McDonald's. Since Haik was terminated by Retzer & Retzer, Inc. and Atkins left employment with McDonald's voluntarily and is now self-employed elsewhere, the court accords Atkins' testimony much greater weight.

Haik, Cummings and Brown testified that evidence of Retzer & Retzer's discrimination against blacks is evident by their refusal to provide blacks with polygraph examinations prior to terminations though such examinations were provided to white employees. Doug Delap testified that the following individuals were terminated for cash shortages. They were: Charles Bailey, a white; Butch Parks, a white; Randy White, a white; Pam Boone, a white; Steve Brown, a white; Larry Miller, Arthra Long, Charles Cummings and Herman Brown, all blacks. Delap testified that the policy at McDonald's is that if employees were caught stealing, they would always be immediately terminated. In the absence of theft, however, the usual disciplinary policy of first warning the employee, then suspending him, and finally terminating him, was utilized. Of the whites who were terminated, Fitzgerald testified that Charles Bailey was given a polygraph examination prior to termination but that the examination was given several months prior to his termination and played no substantial role in the decision to terminate. Bailey took the examination after he had been entrusted with a deposit by Doug Delap and the deposit was $1,400 short. Pam Boone was also provided a polygraph examination prior to termination for a cash shortage of $217.00. Retzer testified that the exam was provided to her, however, only because she had no record of shortages in the past. Cummings, on the other hand, experienced seven shortages prior to the $100 shortage for which he was terminated on July 17, 1982 (Defendants' exhibit 13). The amounts of the prior shortages are $100 on April 10, 1981; $60 on May 24, 1981; $17 on September 18, 1981; $9 on December 28, 1981 and another $9 shortage on February 14, 1982.[2] Michael Retzer further testified that Steve Brown, a white, who experienced a $4,035.12 shortage on July 16, 1983 was given a polygraph, but Retzer testified, only because Brown so requested. Brown failed the polygraph and was terminated. Retzer also testified that Grace Elliot, a white, was not provided

---

**2.** Defendants' exhibit 13 further shows that all employees experiencing a cash shortage or loss of $100 or more were eventually terminated except for Fred Atkins and George Lewis, a white. Atkins had a $100 shortage on September 22, 1983 and one prior shortage of $10 on April 4, 1983. Atkins was polygraphed for the second shortage but was not terminated. George Lewis also experienced a $100 shortage on September 27, 1983, was polygraphed but not terminated at that time. Defendants' exhibit 13 reflects that Lewis had no prior shortages.

a polygraph examination prior to her termination. Don Fitzgerald also testified that Pam Boone was only polygraphed prior to her termination because of a lack of a prior record of shortages and that Steve Brown was only afforded a polygraph examination because he demanded one prior to termination. As Retzer indicated, the polygraph examinations were provided to employees only when no substantial history of cash shortages by an employee existed to indicate that the employee might be pocketing money from the deposit.

In sum, the court finds that Retzer & Retzer had cause to terminate Charles Cummings on July 17, 1982. The amount of money collected from each drawer on Cummings' shift clearly totals $3,750.38, rather than the $3,650.38 recorded by Cummings. Further, Cummings had experienced a total of seven prior shortages from April 10, 1981 until his date of termination on July 17, 1982, a period of little over 15 months. Given this fact and the fact that Grace Elliot, a white, did not receive a polygraph examination prior to her termination and that many other managerial employees with a history of shortages as reflected in defendants' exhibit 13 were also terminated, the court finds that Retzer & Retzer required no further evidence to terminate Cummings.

### Herman Brown

Brown began his employment with McDonald's on November 24, 1974. Michael Retzer testified that Brown experienced a cash shortage on August 9, 1982. The deposit slip filled out by Brown indicated an amount of $1298.94 whereas the actual amount deposited according to the Bank was $1198.94. Defendants' exhibit 13 shows that Brown had two prior shortages, a $60 shortage on April 4, 1981 and an $11 shortage on August 1, 1981. Retzer testified that to validate his suspicions, he "seeded" a drawer on Brown's shift operated by an employee named Brenda on August 14, 1982. Retzer testified that he added $25 to the drawer while the employee was on break and that at the end of the night, the drawer only showed up with an overage of $.77, (See defendants' exhibit 11).

The third reason given for Brown's termination was an accusation by Mark Davis, a McDonald's crew member at the time, that Brown was deleting items of food so that they would not be recorded by the cash register computers. Davis testified that Brown would substitute for the drive-through cashier while the employee went on break during a slow period. As customers called out their order, Brown would punch in the order on the drive-through cash register and the order would appear on the computer screen in the drive-through area, as well as another screen over the grill area that projected the same order. According to Davis, Brown would take the customer's order on the right-hand side of the computer screen and then delete it before the order was rolled over to the left side of the screen. The significance of this, Davis testified, was that orders on the right side of the screen were not banked into the computer's memory whereas those orders and any deletions rolled over to the left side were placed in the memory bank. By deleting items of food from the right side of the screen but accepting the customer's money for all the items, Davis testified that Brown would build up extra cash in the register that would later be skimmed off and pocketed by Brown when he counted the money at the end of the shift. Davis testified that he noticed what Brown was doing since he had been assigned to act as a "runner", or the person who would collect the food and bag the order for Brown. Davis stated that by observing the screen over the grill area, he became aware of Brown's food deletions.

Fitzgerald testified that when Davis told him of Brown's actions, neither he nor Retzer took any actions against Brown. However, the combination of this report by Davis, the failure of Brown to record a $25 overage with respect to the drawer that was "seeded" on August 14, 1982 plus the $100 cash shortage in the deposit on August 9, 1982 led Retzer and Fitzgerald to conclude that Brown should be terminated.

This termination became effective on August 22, 1982. The court finds that Retzer & Retzer had valid cause to terminate Brown because of the three above-described incidents. Accordingly, the court further finds that Brown's termination was motivated, not because of his race, but by credible evidence of his dishonesty.

### Conclusions of Law

I. Claims of Cummings and Brown.

■ Cummings and Brown seek recovery under Title VII and 42 U.S.C. § 1981. However, the court concludes that the 42 U.S.C. § 1981 claims need not be considered with respect to Cummings and Brown since they have failed to assert a section 1981 violation on grounds different from those available under Title VII. As the Fifth Circuit stated in *Page v. U.S. Industries, Inc.*, 726 F.2d 1038 (5th Cir. 1984):

> It is the rule of this Court that consideration of an alternative remedy brought under § 1981 is necessary only if its violation can be made out on grounds different from those available under Title VII. Plaintiffs have not argued that such distinctions exist. In any event, case law in this circuit indicates that the elements of substantive claims of employment discrimination brought under § 1981 parallel those claims brought under Title VII. *See Rivera v. City of Wichita Falls*, 665 F.2d 531, 534 n. 4 (5th Cir.1982).

726 F.2d at 1041 n. 2. *See also Watson v. Fort Worth Bank & Trust*, 798 F.2d 791, 794 n. 4 (5th Cir.1986) (same); *Parker v. Kaiser Aluminum & Chemical Corp.*, 727 F.2d 473, 475 n. 1 (5th Cir.) (same), *cert. denied*, 467 U.S. 1243, 104 S.Ct. 3516, 82 L.Ed.2d 824 (1984).

Normally, once a Title VII case has been tried on the merits, the *McDonell-Burdine* presumptions drop from the case and the court proceeds to the ultimate factual inquiry of whether or not the defendant intentionally discriminated in violation of Title VII. *See United States Postal Bd. of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Barnes v. Yellow Freight Systems, Inc.*, 778 F.2d 1096, 1100 (5th Cir.1985); *Lyford v. Schilling*, 750 F.2d 1341, 1744 (5th Cir.1985); *Mandhare v. W.S. LaFargue Elementary Schl.*, 605 F.Supp. 238, 241 (E.D.La.1985). In the case *sub judice*, however, the court chose not to rule at trial on the defendants' motion for a directed verdict made at the close of the plaintiff's case but instead carried the motion with the case pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. The court accordingly proceeds with its discussion of the plaintiff Brown and Cummings' prima facie evidence.

■ Under disparate treatment analysis, a plaintiff establishes a prima facie case of discriminatory discharge by demonstrating that (1) he is a member of a protected minority group (2) that he was discharged and (3) that he was subjected to the adverse action of which he complains because of his race. *Williams v. Yazoo Valley—Minter City Oil Mills, Inc.*, 469 F.Supp. 37, 48 (N.D.Miss.1978). Pursuant to its findings of fact, the court concludes that both Cummings and Brown have failed in their attempts to establish a prima facie case. Restating and summarizing its findings with respect to Cummings, the court found that Retzer & Retzer terminated Cummings not because of his race but because of a $100 deposit shortage occurring on July 17, 1982; seven prior cash shortages; poor performance reviews; and the one and one-half hour late opening of the Greenville store on January 31, 1982. The court likewise found that Brown was not terminated because of racial animus. Rather, the court found credible Retzer & Retzer's three stated reasons for dismissal. These were: (1) a $100 deposit shortage occurring on August 9, 1982; (2) the failure of Brown to report more than a nominal overage on the night of August 14, 1982 after Michael Retzer had added $25 into one of the cash registers on Brown's shift; and (3) the underringing of sales by Brown as reported by Mark Davis.

■ Supposing that Cummings and Brown had met their initial burden, the court concludes that the defendants articu-

lated justifiable, nondiscriminatory reasons for discharging plaintiffs Cummings and Brown. The court is not only influenced by the defendants' evidence indicating dishonesty on the part of both plaintiffs and unprofessional conduct on behalf of Cummings, but is also persuaded that the terminations were not the result of racial discrimination since Retzer & Retzer also discharged white employees because of cash shortages and other misconduct. As shown by defendants' exhibit 13, and the testimony of Donald Fitzgerald, Retzer & Retzer discharged Pam Boone, Charles Bailey, Randy White, Butch Parks and Steve Brown, all of whom are caucasian for cash control and/or management problems.

The plaintiffs concede this but assert that white employees were granted polygraph examinations prior to discharge while Retzer & Retzer failed to afford blacks this opportunity. The plaintiffs, however, submitted no evidence that they requested polygraph examinations. Steve Brown, a white, made such a request and the request was granted. Further, Michael Retzer testified that polygraph examinations were only given to further substantiate Retzer & Retzer's belief of employee dishonesty. Where an employee suffered an extreme cash shortage with no or little prior history of shortages or other reports or indications of dishonesty, then polygraph examinations were provided. This testimony by Retzer is clearly demonstrated by Pam Boone's cash shortage of $217 on December 18, 1982. As shown by defendant's exhibit 13, Boone had no prior history of cash shortages. Cummings, on the other hand, had experienced seven other cash shortages prior to the $100 shortage on August 9, 1982. As stated previously, reports of sales underrings and the failure of Brown to record more than a nominal overage when Retzer "seeded" a cash register on Brown's shift also aided Retzer & Retzer in assuring itself that Brown was pocketing company money.

The issue in an employment discrimination case is not whether or not an employer had good cause to terminate an employee. Rather, the employer is guilty of racial

discrimination only if the plaintiff moves that he was treated differently because of his race. *Turner v. Texas Instruments, Inc.*, 555 F.2d 1251, 1256–57 (5th Cir.1977) *partially overruled on other grounds, Burdine v. Texas Dept. of Community Affairs*, 647 F.2d 513, 514 (5th Cir.1981); *Williams v. Yazoo Valley—Minter City Oil Mill, Inc.*, 469 F.Supp. 37, 49 (N.D. Miss.1978). In accordance with its findings of fact, the court concludes that the defendants have articulated a legitimate, nondiscriminatory purpose in terminating both Cummings and Brown and in failing to provide them with polygraph examinations prior to their discharges.

■ Again assuming that plaintiffs Brown and Cummings established their prima facie case and concluding that the defendants have established legitimate reasons for their actions, the issue would become whether the defendants' reasons were merely pretextual or whether the defendants intentionally discriminated against the plaintiffs. *Lyford v. Schilling*, 750 F.2d 1341, 1344 (5th Cir.1985). Intentional discrimination may be demonstrated by "persuading the court that a discriminatory reason more likely motivated the employer" or by indirectly showing that the employer's proffered explanation is "unworthy of credence." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). Again, according to the court's findings of fact, the court is neither persuaded by a preponderance of the evidence that Retzer & Retzer's actions with regard to Brown and Cummings were motivated by racial reasons nor that Retzer & Retzer's explanation for its actions are lacking credibility. Accordingly, the court rules for the defendants Retzer & Retzer and Michael Retzer on the claims of Brown and Cummings.

### Claim of Leonard Hudson

■ Plaintiff Hudson alleges that he was discriminatorily demoted and constructively discharged by the defendants in vio-

lation of 42 U.S.C. § 1981. Hudson was given notice of his demotion after his having served as a swing manager for approximately three and one-half months. He asserts that this demotion amounts to a constructive discharge.

In its findings of fact, the court found that Hudson was demoted because of his poor work performance and his immaturity. As with respect to Cummings and Brown, the court is only concerned that Retzer & Retzer apply its policies and rules in a non-discriminatory manner. *See Smith v. Monsanto Chemical Co.,* 770 F.2d 719, 723 n. 3 (8th Cir.1985) (employer may develop arbitrary, ridiculous and irrational rules but must apply them even-handedly). After a full consideration of the evidence as summarized in its findings of fact, the court is of the opinion that Hudson has failed to meet his ultimate burden of proof. Hudson's performance as swing manager in calculating his deposits was clearly substandard. Atkins' testimony that Hudson thought he knew who had taken some missing meat but that Hudson refused to reveal the identity of the person fairly suggests that Hudson could not be adequately trusted. The fact that Hudson was promoted to swing manager *after* refusing to sign an affidavit that Retzer & Retzer desired him to sign indicates that McDonald's felt no malice against him for such refusal. In short, Hudson has not shown, by a preponderance of the evidence, that Retzer & Retzer's legitimate reasons for demoting him are unworthy of credence. Since the court is unpersuaded that Hudson's demotion occurred because of his race, Hudson's constructive discharge claim must likewise fail. As stated in *Kline v. North Texas State University,* 782 F.2d 1229 (5th Cir. 1986), even if an employee's working conditions are intolerable, the employer cannot be found liable under a constructive discharge theory unless the employee shows that the employer "*deliberately* created the intolerable conditions." (emphasis original) *Id.* at 1234. Since the court concludes that Hudson's demotion did not occur for discriminatory reasons, it cannot be said that Retzer & Retzer deliberately created intol-

erable working conditions for Hudson. Rather, the court's view of the evidence indicates that Hudson created the intolerable conditions himself.

In sum, the court finds for the defendants Retzer & Retzer and Michael Retzer individually with regard to all claims. A separate judgment shall be entered by the court.