Charles D.O. KLINE, Plaintiff-Appellee,

v.

NORTH TEXAS STATE UNIVERSITY,
et al., Defendants,

C.C. Nolen, et al.,
Defendants-Appellants.

No. 84-2396.

United States Court of Appeals,
Fifth Circuit.

Feb. 14, 1986.

Jim Mattox, Atty. Gen., James C. Todd, Austin, Tex., for defendants-appellants.

Larry Watts, Houston, Tex., for plaintiff-appellee.

Before IRVING L. GOLDBERG, E. GRADY JOLLY and PATRICK E. HIGGINBOTHAM, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In this case, brought under 42 U.S.C. § 1983, we are asked to review a jury verdict for $200,000 awarded to Charles Kline, a former member of the faculty at the Texas College of Osteopathic Medicine (TCOM). Dr. Kline persuaded the jury that Ralph Willard, the academic dean, C.C. Nolen, the President of North Texas State University (NTSU), Richard Baldwin, the associate dean who replaced Kline, and E.J. Pederson, the chief fiscal officer at TCOM, by their harassment of him, forced him to quit his job, and that this harassment was in retaliation for the exercise of his first amendment rights to speak out against the wrongs he perceived at TCOM. Because we find that a substantial part of the plaintiff's case is barred by the Texas statute of limitations, and that he failed to prove a deprivation of his constitutional rights caused by the defendants-appellants, we reverse.

I

A.

In July 1976, the plaintiff, Dr. Charles Kline, was hired by NTSU and TCOM [1] for the positions of Associate Dean, Acting Chairman of the Department of Pediatrics, and tenured Professor of Pediatrics. As far as we are told, everything rolled smoothly for almost two years.

In June 1978, however, Kline began to receive complaints from department chairmen about budgets and other general problems, but, according to Kline, the appellant Ralph Willard, the academic dean, assured him that his job was secure. But apparently this was not the case. In November 1978, while Willard was out of town, Willard's secretary delivered to Kline a letter terminating his associate deanship. Willard told Kline a few days later that the removal was "for the good of the institution." Not surprisingly, Kline was not in full agreement with this explanation. In December 1978, Kline wrote to defendant-appellant C.C. Nolen, President of NTSU, asking for the reasons for his removal as associate dean. In response, Nolen met with Kline and said that he did not know the reasons for Kline's removal, but he would look into the matter. On March 22, 1979, Kline again wrote to Nolen, but Nolen resigned the presidency of NTSU in April of that year without responding. Kline was not given notice of the charges against him nor was he ever offered an opportunity to be heard prior to the termination of his position as associate dean.

Kline's problems were only beginning. In November 1978, a conflict arose between Dr. Neill and Dr. Gilifillan, both members of the pediatrics faculty. As chairman of the department, Kline encountered, in his words, a combative, uncivil atmosphere, sparked by "remarkable friction" between Gilifillan and Neill. Kline discussed the problem with Willard and the appellant Dr. Richard Baldwin, the new

---

1. TCOM is a branch of NTSU. Both institutions were initially named defendants in this action. The district court found that both TCOM and NTSU were "merely instrumentalities of the State of Texas," and thus Kline was barred from suing the institutions by the eleventh amendment. These parties were dismissed from this action, and are not parties to this appeal.

associate dean, and as a result Willard met with Kline, Neill and Gilifillan on a number of occasions. The dispute continued, however, and Kline asserts that he was unable to discipline Gilifillan without support from Willard and Baldwin, and that no orders were ever given to Gilifillan or Neill to stop their dispute. Kline felt harassed because no one would stop this fuss in the department that he chaired.

Another incident that Kline puts forward as relevant to his claim of a violation of his constitutional rights occurred in March or April 1979. A senior secretary discovered what she regarded as evidence that Gilifillan was pocketing money intended for the clinic. She informed Kline who told her to report the matter to the director of a private consulting firm, which was in charge of the particular account at issue. In early May, at Willard's request, the appellant E.J. Pederson, the Chief Fiscal Officer of TCOM, ordered an audit of the pediatrics clinic. The audit disclosed fiscal management problems, and thereafter a letter was drafted by Pederson and signed by Willard charging Kline with mismanagement and relieving him of authority for the department's financial affairs. During this same period of time, Kline contends that Gilifillan further harassed him and still nothing was done by Willard or others to stop this harassment.

Kline and Neill protested both the audit and the letter from Willard and Pederson, and requested an independent audit. Shortly thereafter, Kline, Neill, Willard, and Kline's counsel met at a restaurant to discuss the letter, and the department's problems in general. Kline explained to Willard that Gilifillan was harassing him,[2] and told Willard that he might be forced to take a leave of absence. Willard assured Kline that his job was secure, and he agreed to retract the word "mismanagement" from the letter.

When Gilifillan's harassment did not cease, Kline took a leave of absence in August 1979. Under the terms of the leave, which was effective through August 31, 1980, Kline retained full rank and tenure as professor. In late November or early December of 1979, Kline talked with Willard and asked if he could return to TCOM. Willard agreed, and Kline returned to TCOM on December 5, 1979. Kline asked only for his professorship; he did not ask that the new acting chairman of the department, Gilifillan, be removed so that he could resume that position. Kline and Willard met in Willard's home and reached an agreement concerning Kline's return to the faculty. Willard then left town, but before leaving, he directed his secretary to set up an appointment for Kline to see Gilifillan. Gilifillan was in a contrary mood. He told Kline at their meeting that he would not allow Kline to practice medicine at all, but would allow him only to perform other doctors' research, thereby contradicting the terms to which Willard had previously agreed. Gilifillan did not indicate that he was speaking for Willard, and because Willard was out of town, Kline did not attempt to clarify any misunderstanding with him.

Rather than verify his agreement with Willard, Kline returned to Kirksville, Missouri, where he received Willard's letter of December 7, 1979, offering him his professorship under the terms to which he and Willard had agreed. Kline did not respond to Willard's letter and did not return to TCOM on February 1, 1980, as he had earlier agreed with Willard. In April 1980, Kline joined the faculty of the Kirksville College of Osteopathic Medicine, where he had been employed prior to July 1976. On August 31, 1980, Kline's relationship with TCOM was officially severed when he did not return from his leave of absence.

### B.

On September 1, 1981, Kline filed suit in district court under 42 U.S.C. § 1983.

---

**2.** Kline alleges that Gilifillan's harassment consisted of: refusing to treat a child in the emergency room because the boy was a patient of Dr. Neill; repeated complaining and spreading rumors about Neill and Kline; reading Neill's and Kline's charts without their authority; and speaking with Baldwin about Kline and Neill without Kline's knowledge.

Kline contended that: 1) his request to Nolen for the reasons for his dismissal as associate dean; and 2) his challenge of the audit conducted by Pederson constituted protected speech under the first amendment. Kline contended that in retaliation for this protected speech, the defendant-appellants caused Kline to be removed as associate dean and constructively discharged as chairman and professor at TCOM.

The jury returned a verdict in favor of Kline and awarded $200,000 in damages. The jury found that Kline's protected speech was a "substantial or motivating factor" in his dismissal as associate dean and as chairman and professor of the pediatrics department. Moreover, the jury found that Kline had been removed from these positions in violation of his substantive and procedural due process rights. The defendant-appellants filed a motion for judgment notwithstanding the verdict and/or for a new trial, which the court denied. The defendant-appellants then filed a timely notice of appeal.

## II

Several issues are raised on appeal. The defendant-appellants contend that they have qualified immunity from suit unless their "conduct ... violate[d Kline's] clearly established ... constitutional rights." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The defendant-appellants next contend that Kline was not constructively discharged, that Kline's speech was not protected, and that Kline's cause of action is barred by the statute of limitations. Finally, the defendant-appellants contend that the evidence in the record is either nonexistent or insufficient to support the jury's verdict. Suffice it to say only that Kline vigorously disagrees with the defendant-appellants.[3]

We need not reach each of these issues. Since we find that the applicable Texas statute of limitations bars Kline's action for injuries resulting from his termination as associate dean, and that, even if Kline was constructively discharged, the evidence does not support the jury finding that the defendant-appellants' actions were causally related to that discharge, we reverse and remand without reaching these other issues.

## III

### A.

In section 1983 actions, federal courts must look to state law to find the appropriate statute of limitations. *Ehlers v. City of Decatur*, 614 F.2d 54, 55 (5th Cir.1980). It is undisputed in this case that the Texas statute of limitations imposes a two-year time limit for section 1983 actions. Tex. Civ.Stat.Ann. art. 5526 (Vernon Supp.1984). Although the appropriate statute of limitations is determined by reference to state law, the question of *when* a federal cause of action accrues is a matter of federal law. *Lavellee v. Listi*, 611 F.2d 1129, 1130 (5th Cir.1980). In civil rights cases, this court has held that "a cause of action commences when a plaintiff knows or has reason to know of the injury which is the basis for the action." *Drayden v. Needville Independent School District*, 642 F.2d 129, 132 (5th Cir.1981). Applying this standard, we must determine when Kline's cause of action commenced.

Kline contends that his cause of action did not arise until August 31, 1980, his last day of employment as a professor and chairman at TCOM. To support this proposition, Kline cites *Rubin v. O'Koren*, 621 F.2d 114, 116 (5th Cir.1980) and *Lecompte v. University of Houston Systems*, 535 F.Supp. 317, 320 (S.D.Tex.1982). In both *Rubin* and *Lecompte*, the court determined that the plaintiffs, who were untenured

---

**3.** Also raised in this appeal is whether Kline had a property interest in his positions as associate dean, professorship or chairmanship, that was taken away without due process. The parties differ on whether Kline's contracts stated that

he served at the pleasure of the administration. As this case can be decided without ruling on Kline's property interest claims, we do not resolve this issue.

university professors, did not have a cognizable cause of action against the university until their last day of employment. These cases, however, are not dispositive in the instant case because Kline, unlike Rubin and Lecompte, was dismissed from three independent positions at TCOM. Stated differently, Kline's complaint may be parsed into three separate causes of action.

▓ Each of these separate alleged violations accrues at the time that he was terminated from each position, not simply from the date of his final severance from TCOM.[4] The record shows that Kline was removed as associate dean in November of 1978, and that his positions as chairman and professor were terminated sometime between August 1979, when he took his leave of absence, and August 1980, when he failed to return. Thus, Kline's cause of action for his removal as associate dean accrued in November of 1978, the last date of his employment in that position. As a result, we hold that the part of Kline's case that relates to his termination as associate dean is barred by the Texas statute of limitations and dismiss with prejudice that part of Kline's claims.[5]

▓ Kline's last day of actual employment as chairman and professor at TCOM was in August of 1979, a date outside the relevant statute of limitations. Kline, however, began his leave of absence at that time with the reasonable expectation of returning. For this reason, we will not say on the record before us that as of August 1979, Kline knew or had reason to know of the injury—that is, his constructive dismissal from these positions—which is the basis of his cause of action.[6] Thus, we hold that Kline's claims relating to injuries resulting from his constructive dismissal from these positions are not barred by the statute of limitations.

### B.

The question we address on the causes of action relating to Kline's termination as professor and chairman is not whether Kline was constructively discharged, but rather whether *these defendant-appellants* constructively discharged Kline, as the jury found.[7] Kline contends that he

4. In *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), the Supreme Court held that a cause of action for unlawful dismissal accrued when the plaintiff was informed that his employment would be terminated rather than the actual date of termination. In the instant case, Kline was never informed that his positions as professor and chairman were to be terminated so Kline's cause of action could not have accrued prior to his departure from TCOM.

5. There is another substantial flaw in Kline's claim for damages for injuries resulting from his dismissal as associate dean. Kline contends, and the jury found, that his dismissal was the proximate result of his protected speech. Kline's protected speech, however, is alleged to be the letter that he wrote to Nolen inquiring about the reasons for the termination of his position as associate dean, and Kline's challenge of the results of the audit of his department. In both instances, this speech occurred *after* Kline was dismissed as associate dean. Without determining whether the speech in question was in fact "protected" under the first amendment, we fail to see how the appellants could have dismissed Kline in retaliation for speech that had not yet occurred.

6. The record is unclear as to whether Kline left TCOM in August of 1979 knowing that he would

not return as Chairman of the Pediatrics Department. If Kline knew that he would not resume that position at the end of his leave of absence, the statute of limitations on any claims relating to the chairmanship position began running in August of 1979. If Kline was not aware of the permanence of his termination as chairman, then the statute of limitation did not begin to run until December of 1979 when Kline failed to request that his chairmanship position be returned at the end of his leave of absence. We need not resolve the factual conflict since this case is decided on other grounds.

7. In *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir.1969) (en banc) this court stated the tests for determining the sufficiency of evidence for the purposes of granting a directed verdict or a judgment notwithstanding the verdict after a jury determination. This standard is equally applicable when an appellate court reviews a jury verdict. In effect, we are reviewing the district court's denial of the defendant-appellants motion for a judgment notwithstanding the verdict. As our opinion makes clear, *infra* pp. 1235–36, the record in this case contains insufficient evidence for a jury reasonably to find that these defendant-appellants, individually or collectively, constructively discharged Kline. The district court therefore abused its

was removed from his positions as chairman and professor in retaliation for speech that was protected under the first amendment. The jury found that Kline was "terminated, actually or constructively," from his positions as chairman and professor and that Kline's "protected speech" was a "substantial or motivating factor" in the defendant-appellants' decision to terminate Kline. Since there is no evidence in the record even suggesting that the defendant-appellants actually discharged Kline, the jury verdict can only be interpreted to mean that the jury found that Kline was constructively discharged.

An employee will be held to have been constructively discharged "if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Young v. Southwestern Savings and Loan Association*, 509 F.2d 140, 144 (5th Cir. 1975). In a case of constructive discharge, the employer is liable for illegal conduct leading to the discharge, just as he would be in a case of formal discharge. This court has previously recognized that constructive discharge may be an appropriate basis for a section 1983 action. *See Schneider v. City of Atlanta*, 628 F.2d 915 (5th Cir.1980); *Smith v. Board of Regents*, 426 F.2d 492, 494–95 (5th Cir.1970).

■ In the instant case, we need not consider the ultimate question of whether the evidence supports a jury finding that Kline's working conditions at TCOM became so intolerable that he was forced to resign. We are spared resolution of that question because even if Kline's working conditions at TCOM were intolerable, Kline has failed to show how the defendant-appellants, individually or collectively, *deliberately* created the intolerable conditions.

We must keep in mind that TCOM is not a defendant, *see supra* note 1, and thus the defendant-appellants cannot be held vicariously liable simply because of their positions at TCOM. These defendant-appellants are being sued in their individual capacities for their individual acts. Second,

we especially note that Gilifillan was not made a defendant in this case. It was Gilifillan against whom all of Kline's claims of harassment are directed. It was Gilifillan who, as Chairman of the Department of Pediatrics in December of 1979, imposed the final conditions on Kline's employment that made continuation of his employment so intolerable as to culminate in a constructive discharge. These December 1979 conditions, the sine qua non of Kline's theory of constructive discharge, were, however, a contradiction to Willard's terms that were acceptable to Kline. Yet Willard becomes a defendant and Gilifillan does not. Third, the record shows that each time Kline brought his difficulties to the attention of Willard, Willard was willing to meet and discuss the disputes within Kline's department, and never took a position opposing Kline. Fourth, after Pederson's audit revealed fiscal irregularities in Kline's department, Willard did not ultimately blame Kline for the department's mismanagement, and, in fact, altered the audit report to absolve Kline from blame. Fifth, when Kline wanted relief from the pressures he was encountering, Willard granted Kline's requested leave of absence instead of requiring that Kline terminate his positions. Sixth, Willard accepted Kline's early return from his leave of absence, which he did not have to do, upon terms agreeable to Kline. Finally, Kline never attempted, even in passing, to resolve the conflict between the terms offered by Willard and the more onerous terms imposed by Gilifillan. When Kline received Willard's letter offering him a return to his positions on the agreed conditions, Kline failed even to respond to the letter. These facts hardly evince an effort deliberately to create intolerable conditions.

With respect to the other defendant-appellants, Kline fares no better. In attempting to show that they were responsible for deliberately creating intolerable working conditions, Kline alleges that Pederson con-ducted an audit and wrote a letter which

discretion in denying the defendant-appellants motion.

resulted in Kline being removed from the financial controls of the pediatrics department; was friends with Gilifillan; and assumed financial control of the pediatrics department after Kline. Baldwin is alleged to have accepted the position of associate dean after Kline was removed from this post; to have been a friend of Gilifillan; and to have failed to assist Kline with the difficulties in the pediatrics department. We fail to see how these acts, under any theory of proximate causation, can establish the crucial causal connection between these defendant-appellants' acts and Kline's alleged constructive discharge.

### C.

Kline urges that the real gist of his lawsuit is not so much that the defendant-appellants deliberately created intolerable working conditions, but that *by failing to act,* the defendant-appellants allowed intolerable conditions created by a third party, Gilifillan, to exist. In order to hold the defendant-appellants liable for failing to act, Kline must show that they had some legal duty to act to prevent or prohibit Gilifillan's harassment of Kline. We find no such duty on which liability can be based. First, Kline has not alleged, nor can we find, any individual duty they owed Kline that would trigger an affirmative duty to act. Second, the only other bases for finding such a duty arises out of the defendant-appellants' positions at TCOM. It is clear that they cannot be held liable for any duty to prohibit Gilifillan's acts under the doctrine of *respondeat superior,* because the Supreme Court has held that section 1983 "will not support a claim based on a *respondeat superior* theory of liability." *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981). There remains, then, the duty to supervise the department and its personnel so as to abate the disputes Gilifillan pursued with Kline. This court has held that "[A]lthough supervisory officials cannot be held liable solely on the basis of the employer-employee relationship with a tortfeasor, they may be liable when their own action or inaction, *including a failure to supervise that amounts to gross negligence or deliberate indifference,* is a proximate cause of the constitutional violation." *Bowen v. Watkins,* 669 F.2d 979, 988 (5th Cir.1982) (emphasis added). Under this theory as it applies here, we are to keep in mind the requirement in constructive-discharge cases that the intolerable conditions must result from deliberate acts of those who would be held accountable. As that requirement relates to our consideration here, it means that a failure to supervise must be the result of a deliberate decision not to supervise or the result of gross negligence, but not the result of ordinary negligence, inadvertence or managerial incompetence.

■ We now consider the positions of the individual defendant-appellants separately. The record presents no evidence that Pederson or Nolen were in a supervisory position to either Kline or Gilifillan. Pederson, as chief financial officer, was under no duty to supervise personnel in the Pediatrics department. Nolen, as president of NTSU, was charged with the overall functioning of the state university. Kline has presented no evidence indicating that Nolen involved himself in the daily operations of the different departments of the various branches of NTSU. In fact, the record presents no evidence that Nolen ever even heard of Gilifillan, let alone deliberately permitted him to continue his harassment. Thus, we find that neither Pederson nor Nolen had a duty to supervise so there can be no liability for any alleged failure to do so.

■ Both Willard, as academic dean, and Baldwin, as the associate dean, occupied positions whose authority extended to the supervision and discipline of faculty members. The record cannot support a finding, however, that either Willard or Baldwin deliberately, or with gross negligence, failed to supervise adequately. Willard and Baldwin never took positions opposing Kline, and as we discussed earlier, repeatedly tried to negotiate a settlement

between Kline and Gilifillan. The only remaining action that Willard or Baldwin could have taken was to have fully supported Kline in his disputes with Gilifillan. Kline has not alleged that Willard and Baldwin ignored the dispute going on within the pediatrics department, but rather that they failed to take the effective actions that Kline desired, which, it is supposed, would have required the discharge of Gilifillan if all else failed to stop his personal disputes with Kline. Where, as here, there is no evidence that the internal dispute is based upon or motivated by unlawful reasons, we refuse to hold that adequate supervision should be equated with taking sides among disputatious colleagues.

Since we find that neither Pederson nor Nolen had any duty to act, we cannot hold them liable for failing to do so. While Willard and Baldwin did have a duty to supervise, there is no evidence that either of them deliberately, or with gross negligence, failed to perform that duty.

### IV

Thus our holding in its final conclusion avoids reaching either the question whether Kline's "speech" was protected under the first amendment or whether Kline was constructively discharged. It follows, therefore, that we do not reach the ultimate question whether Kline was constructively discharged because he engaged in protected activity. If conditions were intolerable, Gilifillan, not the defendant-appellants made them that way. For whatever reasons, Kline chose not to sue Gilifillan, not to allege, plead, nor prove a conspiracy that would connect Gilifillan's acts of harassment to the defendant-appellants.

Because we find no evidence to support the jury finding of liability on the part of the defendant-appellants for the alleged constructive discharge of Kline, the judgment of the district court is

REVERSED AND RENDERED.