AUSTER OIL & GAS, INC., Plaintiff–
Appellee Cross–Appellant,

v.

Matilda Gray STREAM, Harold H.
Stream, III, M.G.S. Lake Charles, Inc.,
and Edward M. Carmouche, Defend-
ants–Appellants Cross–Appellees.

No. 86–4584.

United States Court of Appeals,
Fifth Circuit.

Jan. 14, 1988.

David R. Frohn, A.J. Gray, III, Lake Charles, La., for Carmouche.

Drew Ranier, Lake Charles, La., for Matilda Gray Stream, Harold H. Stream, M.G.S. Lake Charles.

William E. Shaddock, Bernard H. McLaughlin, Jr., William B. Monk, Lake Charles, La., for Auster Oil & Gas, Inc.

Before RUBIN, GARZA, and JONES, Circuit Judges:

EDITH H. JONES, Circuit Judge:

For the third time, this action for damages by reason of an unconstitutional search and seizure of property appears before us. A prior panel opinion, *Auster Oil & Gas, Inc. v. Stream*, 764 F.2d 381 (5th Cir.1985), reversed the dismissal of the plaintiff's complaint for failure to state a claim, and the case was remanded for a trial on the merits. At trial, the jury exonerated the defendant state trooper on the grounds of qualified immunity but found that defendants Matilda Gray Stream ("Mrs. Stream"), Harold H. "Spook" Stream ("Spook Stream"), M.G.S. Lake Charles, Inc. ("M.G.S."), and their attorney Edward M. Carmouche ("Carmouche") had violated the fourth amendment rights of Auster Oil & Gas, Inc. ("Auster"). The jury awarded Auster $250,000 actual and a total of $5,000,000 punitive damages. The district court remitted $4,350,000 of the punitive damages, and awarded Auster over $300,000 in attorneys' fees and expenses pursuant to 42 U.S.C. § 1988. The Streams, M.G.S., and Carmouche now appeal from the judgment of the district court, and Auster cross-appeals certain aspects of the award of attorneys' fees. We reverse and render in part, remand for a new trial on damages and affirm in part.

The background and facts of this case are set out fully in the prior panel opinion, 764 F.2d at 384–86. To summarize briefly, Mrs. Stream and M.G.S. granted Auster and other lessees an oil, gas, and mineral lease on lands in Calcasieu Parish, Louisiana, in 1971, retaining significant royalty interests. Auster was designated as operator of the properties. In the early 1980's, allegations of oil thievery surfaced, and the Louisiana state police began a criminal investigation into whether Auster or anyone else had been stealing oil from the leases. Trooper First Class Al Martin, assigned to the case, was brought into contact with Carmouche, who was the attorney representing M.G.S. and the Streams. Shortly afterward Mrs. Stream and her son Spook Stream, authorized Carmouche to investigate Auster's operations.

In April 1983, Carmouche demanded that Auster cancel its leases, accusing Auster of operating a network of secret pipelines and tanks through which it was illegally siphoning off oil. Auster denied the allegations. Although the state police closed their investigation in July 1983 without bringing charges, Carmouche continued his own inquiries. After several meetings, Carmouche, his investigators, and Trooper Martin devised a high-tech surveillance plan to determine whether oil was being stolen from the leases.

The plan called for inserting plastic capsules containing microfilm, called microchips or microdots, into pipelines near the wellheads, and placing screens in the pipelines at the point where they left the Streams' lease property. In theory, the flow of the oil would carry the microdots through the pipeline and into the screens, where they would be recovered. If a substantial number of the microdots failed to appear in the screens, this could mean that Auster was diverting oil from the pipelines, and Carmouche's suspicions of theft would have been in some measure substantiated.

On September 25, 1983, several of Carmouche's agents, one of whom was Joe Mize, his son-in-law and law partner, executed this plan while Martin and other Louisiana state police officers served as lookouts. No search warrant had been obtained or sought.

Unfortunately for defendants, their sophisticated technology failed in its appointed task. The microdots got stuck in the wellheads and pipelines, damaging Auster's equipment, causing leaks of several barrels of oil, and, according to Auster, damaging the underground formations to such an extent that all production from one well was lost. When Auster discovered the cause of these problems, it demanded compensation from the Streams and sought an injunction in state court to prevent further intrusions.

This lawsuit was filed in December 1983, alleging that Mrs. Stream, M.G.S., and Trooper Martin had conspired, *inter alia*, to conduct an unlawful search and seizure

in violation of the fourth amendment. It also asserted that the operation was instigated, not to investigate reports of thievery, but for the purpose of breaking Auster's leases so the Streams could use the property for other purposes. In April 1984, the district court granted Mrs. Stream and M.G.S.'s motion to dismiss for failure to state a claim, concluding that Auster had failed to allege the state action requisite for a § 1983 action. The court also held that because the leases entitled the private defendants to investigate Auster's operations, there had been no constitutional violation. Auster sought interlocutory review of this dismissal, which this court refused.

Auster immediately attempted to amend its complaint to cure the pleading defects and moved for reconsideration of the district court's dismissal of the prior complaint. Alternatively, it sought to have the district court enter a final judgment regarding Mrs. Stream and M.G.S. to facilitate an interlocutory appeal. The court denied the motions to amend and to reconsider, but it did enter the requested final judgment.

Our prior panel held that Auster's allegations that Mrs. Stream and M.G.S. had acted "in concert" with Trooper Martin were sufficient to support a claim of state action under 42 U.S.C. § 1983. The decision went on to hold that the complaint adequately stated a claim under § 1983 for a violation of the fourth amendment, and it rejected arguments that the lease agreements or provisions of the Louisiana Mineral Code authorized the operation. Finally, the court held that Auster should have been allowed to amend its complaint to cure the pleading defects. The case was remanded for trial.

Back in the district court, Auster amended its complaint not only to cure the prior defects but also to add Carmouche and Spook Stream as defendants. Except as to Trooper Martin, the jury found liability with a vengeance. Actual damages of $250,000 were assessed against the private defendants *in solido*, and the jury imposed punitive damages of $2,500,000 against

Carmouche, $1,500,000 against Spook Stream, $500,000 against M.G.S., and $500,-000 against Mrs. Stream. The district court reduced the punitive damages to $500,000 against Carmouche, $100,000 against Spook Stream, $40,000 against M.G.S., and $10,000 against Mrs. Stream. This vigorously contested appeal followed.

## I. *Fourth Amendment Violation*

■ Appellants re-assert their defense, raised in the prior appeal of this case, that no unlawful search or seizure occurred because Auster had no reasonable expectation of privacy in the production operations, well bore, pipelines or production equipment on the Ged Lease. Our prior panel held that, if Auster had a reasonable expectation of privacy, the conduct alleged on the part of defendants would be unconstitutional. The panel specifically rejected assertions that § 31:177 of the Louisiana Mineral Code or the defendants' lease agreement with Auster would vitiate the reasonableness of Auster's expectations. 764 F.2d 390–91. At trial, Auster introduced evidence supporting its contention that it has a reasonable expectation of privacy in conducting lease operations without surreptitious interference by appellants. An expert witness confirmed that under the various agreements between the appellants and Auster, appellants were not authorized to conduct the non-consensual microdot operations. The parties stipulated that Auster had an *exclusive* right to operate the production facilities and equipment. It was further uncontested that the defendants' operation interfered with Auster's production activities. There was evidence that the interference with Auster's "possessory" interest was not insubstantial, involving the dismantling of choke assemblies on the wells with resulting damage to Auster's equipment and permanent loss of all production from the J–8 well. The fact that the seizure proceeded without a warrant necessitates a presumption of unreasonableness. *United States v. Karo*, 468 U.S. 705, 718, 104 S.Ct. 3296, 3304, 82 L.Ed. 2d 530 (1984). In sum, there was sufficient evidence that Appellants engaged in an unreasonable search and seizure, as defined

by the prior panel, and thus the jury could properly find a violation of the fourth amendment. We find no meaningful distinction between the arguments advanced by Appellants on the prior appeal to qualify Auster's expectation of privacy, and those they now assert. We are bound by our prior rejection of those arguments.

## II. *Qualified Immunity*

 Appellants assert that they should have been allowed the defense of qualified immunity as a matter of law, because, as private parties acting under color of state law, they are entitled to the same immunity as state officials performing discretionary functions. *Folsom Investment Co., Inc. v. Moore*, 681 F.2d 1032, 1037 (5th Cir.1982). After careful review of the record, we are unable to conclude that the defendants raised or preserved a qualified immunity defense in the trial court, and we must decline to review this issue. *Nissho–Iwai Co. v. Occidental Crude Sales*, 729 F.2d 1530, 1549 (5th Cir.1984). Unlike Trooper Martin, whose defense of qualified immunity permeates the pretrial record and was submitted to the jury,[1] the appellants made no mention of it in the pretrial order, or in oral or written motions for directed verdict, nor did they request jury issues covering this affirmative defense.[2] Appellants lodged no objection to the court's charge concerning this issue. The issue was not squarely posed until the filing of appellants' motion for new trial, which was too late. Fed.Rules Civ.Proc. 16(e), 50(b), 51. *Id.* Thus, the trial court lacked a fair opportunity to address the qualified immunity defense, as it did in Trooper Martin's case.

We do consider on appeal an issue not properly raised below but only if it involves a pure legal question and our failure to consider it would result in a miscarriage of justice. *Nissho–Iwai Co. v. Occidental*

*Crude Sales*, 729 F.2d 1530, 1549 (5th Cir. 1984). Had appellants timely asserted the defense of qualified immunity, subsidiary questions of fact might have arisen, such as what information they possessed that might have led a reasonable person to think that a warrantless search and seizure was lawful. *Anderson v. Creighton*, —— U.S. ——, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987). Because a qualified immunity defense might have involved factual questions and because appellants' failure to assert the defense until after trial deprived the district court of a fair opportunity to address the issue, we decline to review the issue on appeal. *Id.*

## III. *Vicarious Liability*

It is well-settled that § 1983 liability cannot be based solely on vicarious liability or *respondeat superior*. *Monell v. Dept. of Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Kline v. North Texas State University*, 782 F.2d 1229, 1234 (5th Cir.1986); *Thibodeaux v. Arceneaux*, 768 F.2d 737, 739 (5th Cir. 1985). The Streams contend that there was no evidence that they actually participated in the planning or execution of the operation, and thus the jury incorrectly found them liable under some notion of vicarious liability for the acts of their attorney Carmouche. For himself, Carmouche contends that there was no evidence in the record linking him personally to the planning or execution of the microdot operation, and thus he cannot be held liable for the acts of his agents.

 Appellants' contention is clearly correct insofar as it applies to Mrs. Stream. We find no evidence in the record that Mrs. Stream was involved in or even knew of the microdot operation before it occurred, and Auster apparently concedes this fact. However, appellee argues that Mrs. Stream's liability flows from her *failure* to

---

1. We intimate no opinion concerning whether or not qualified immunity was properly an issue for the jury.

2. Appellants' proposed issue No. 23, contrary to their contention in this court, sought jury consideration of derivative immunity, based on

*Guidry v. Ford*, 431 F.2d 660, 664 (5th Cir.1970), overruled by *Sparks v. Duval County Ranch Co., Inc.*, 604 F.2d 976 (5th Cir.1979), cert. den., 449 U.S. 1021, 101 S.Ct. 588, 66 L.Ed.2d 483. This issue is legally distinct from that of qualified immunity. *Folsom*, 681 F.2d at 1037.

act, in not adequately supervising her son and Carmouche. This theory of § 1983 liability was discussed by this court in *Kline*, where we held that liability will be visited on a non-acting superior only when he has a legal duty to act to prevent the misdeeds of his agents or subordinates, and where his failure to act or supervise amounts to gross negligence or deliberate indifference. 782 F.2d at 1235. In the case at bar, the record indicates no such duty to act on the part of Mrs. Stream. She was not involved in the day-to-day operations of her mineral interests, and there is no evidence that she knew of the microdot operation before the fact. Furthermore, there is no indication that entrusting her business affairs to her son and Carmouche was in any way negligent or the result of deliberate indifference.

■ However, there is sufficient evidence in the record to support the jury's finding on Spook Stream's liability. It was not disputed that Carmouche had informed Stream of the microdot operation before the fact, that Stream had signed the check used to purchase the microdots, and that he had signed an agreement holding harmless one of the participants in the operation. There is evidence in the record suggesting that Spook Stream may have known that Mize, Carmouche's son-in-law and an attorney in his firm, had concluded in a pre-operation memorandum that the participants could be liable for damages that resulted from the operation. Reviewing all this evidence in the light most favorable to Auster, we find that the jury could have properly concluded that Spook Stream acquiesced in Carmouche's plans and was directly involved in the operation. As a result, his assertion that the jury improperly based his culpability solely on vicarious liability is groundless.[3]

3. Because the record also shows that Stream was acting at all material times in his capacity as either vice-president and/or secretary of M.G.S., his actions constitute the official imprimatur needed to hold the corporation liable under § 1983. *See White v. Washington Public Power Supply System*, 692 F.2d 1286, 1290 (9th Cir.1982) (corporation can be liable under

■ There also is sufficient evidence to find that Carmouche was personally involved in the microdot operation. He delivered the microdots to the agents and state police on the day they inserted them into the wells. There was evidence that Carmouche was routinely informed by Mize of the planning of the operation and of its potential legal consequences. Furthermore, a major defense of the Streams at trial was predicated on the theory that they were acting at all times on the advice of counsel. For Carmouche now to claim that there was no evidence that he was involved in or knew anything of the actual operation is most unconvincing.

## IV. *Stachura Error*

The district court instructed the jury that, in addition to property damages and compensation for the lost use of the facilities, Auster could "recover, if proven, damages for the violation of [its] constitutional rights." After the verdict, the Supreme Court held that such an instruction was erroneous. *Memphis Community School District v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 2543–45, 91 L.Ed.2d 249 (1986). When the *Stachura* decision was brought to the attention of the district court, the court held that the instruction disfavored in *Stachura* was distinguishable from the one at bar, and that any error in the instruction was harmless because the jury's verdict on actual damages was otherwise supportable by the evidence.

■ We disagree with these conclusions. In *Stachura*, the Supreme Court reiterated that § 1983 is designed to compensate persons for actual injuries caused by the deprivation of constitutional rights. Consequently, a party may not be compensated solely for the bald deprivation of a constitutional right.[4] 106 S.Ct. at 2543. The clear import of the district court's instruction in

§ 1983 if there is a showing of official sanction of the conduct or practice at issue).

4. We emphasize that this analysis is limited to actual damages. A party may, in an appropriate case, receive punitive damages in a § 1983 action even though he has incurred no or minimal actual damages. *See Stachura*, 106 S.Ct. at 2542 n. 9.

the case at bar was that the abstract violation of a constitutional right was compensable. Such an instruction is legally indistinguishable from that in *Stachura:* both instructed the jury that they could award actual damages for the intrinsic value of the deprivation of a constitutional right. The instruction was thus erroneous.

Auster contends, however, that there was evidence to support an award of no less than $250,000 actual damages, from which it follows that any error was harmless. We disagree. Where damages instructions are faulty and the verdict does not reveal the means by which the jury calculated damages, correction of the error is difficult, if not impossible. In such situations, a new trial on actual damages is required. *Stachura,* 106 S.Ct. at 2546; *Bailey v. Andrews,* 811 F.2d 366, 376–77 (7th Cir.1987).

Actual damages were submitted here via a general verdict, and it is impossible for us to determine the extent to which the jury impermissibly compensated Auster for the abstract value of the deprivation of its fourth amendment rights. The evidence does not suggest that $250,000 is the absolute minimum any reasonable jury could have awarded in actual damages. The vast majority of Auster's asserted actual damages stem from loss of production from the J–8 well, and the valuation of such loss as well as the causal connection between the microdot operation and the loss of production were hotly contested. The jury might have awarded nothing for the loss of production and a substantial figure for the violation of Auster's rights; it could have based its award primarily on proven economic damages; it could have reached any conclusion between these extremes. We decline to speculate on the most likely one, and leave the determination of damages for a properly instructed trier of fact.

## V. *Passion and Prejudice in the Jury Verdict*

■ Appellants contend that, under this court's decision in *Wells v. Dallas Independent School District,* 793 F.2d 679, 683–84 (5th Cir.1986), the jury's $5,000,000 verdict on punitive damages was so excessive as to indicate inherent passion and prejudice, and it was, therefore, an abuse of discretion for the district court to order a $4,350,000 remittitur rather than grant a new trial. We agree.

In *Wells,* the court held:

... when a jury verdict results from passion or prejudice, a new trial, not remittitur, is the proper remedy. On the other hand, damage awards which are merely excessive, that is, so large as to be contrary to right reason, are candidates for remittitur. However, at some point on the scale an excessive award becomes so large that it no longer can be considered merely excessive. At that point, when an award is "so exaggerated as to indicate bias, passion, prejudice, corruption, or improper motive," remittitur is inappropriate and the only proper remedy is a new trial.

793 F.2d at 683–84 (citations omitted). The court concluded that an award so large that it compelled the district court to reduce it by a factor of seven was inherently indicative of passion or prejudice, and a new trial was ordered.

Such is the case here.[5] The ratios of the punitive damages awards to remittiturs in this case ranged from 5 to 1 for Carmouche to a stunning 50 to 1 for Mrs. Stream. Even after the remittitur, a punitive damage award of $650,000 in a case such as this appears excessive. These facts, along with our review of the record in this case, leave us with the inescapable conclusion

---

5. Auster argues that *Wells* is inapplicable to cases involving large-scale remittiturs of punitive damages, citing *Curtis Publishing Co. v. Butts,* 351 F.2d 702 (5th Cir.1965). We disagree. *Butts* predicates its holding that remittitur is preferable to a new trial on the assumption that the jury has not been swayed by passion and prejudice. 351 F.2d at 718–19. Our review of the record leads us to agree with appellants that the jury ran amok on the issue of punitive damages. *Butts* may well counsel courts that they should ordinarily favor the remedy of remittitur when excessive punitive damages are involved, but it does not affect or negate the holding of *Wells:* that at some point a verdict can be so excessive as to constitute a *per se* indication of prejudice and passion, and require a new trial.

that the jury was motivated by passion and prejudice in their award of punitive damages. Therefore, we hold that a new trial is required on this issue as well.[6]

## VI. *Conflict of Interest*

The Streams contend that they are entitled to a new trial on the grounds that their trial counsel had an improper conflict of interest in the case. Specifically, they assert that Carmouche's law firm, which handled the case for all defendants, prejudiced their case by, *inter alia*, not arguing that Carmouche was the principal actor in the case and that the Streams were not involved or only indirectly involved. They further assert that this was not done because such arguments would have been deleterious to Carmouche's case. Moreover, they claim that Carmouche's firm misled them about the nature and significance of the potential conflict. Auster does not appear to question seriously that a conflict of interest was potentially present, but instead argues 1) that the matter was raised pretrial and the district court's actions taken at that time were proper and foreclose any complaint of conflict by the Streams, 2) even if there was an improper conflict, the Streams were not prejudiced by it, and 3) the conflict of interest argument is a ploy by the Streams to obtain a tactical advantage.

■ Auster has the better argument. While the potential for conflict existed, the trial court held a hearing on this issue and concluded that the Streams were aware of it and acquiesced in the arrangement for their defense. The court's conclusion is not clearly erroneous. Thus, we need not speculate further on the trial court's responsibility, if any, to ensure conflict-free representation in a civil case.

## VII. *Prescription*

Carmouche contends that as he was not joined as a defendant until more than two years after the microdot incident, Auster's claim against him prescribed under the applicable one-year statute of limitations. We disagree.

In § 1983 cases, federal courts look to the most consonant statute of limitations of the forum state. *Kitrell v. City of Rockwall*, 526 F.2d 715, 716 (5th Cir.), *cert. denied*, 426 U.S. 925, 96 S.Ct. 2636, 49 L.Ed.2d 379 (1976). For § 1983 cases brought in Louisiana federal courts, the appropriate statute of limitations is one year. La.C.C.Art. 3536; *Kissinger v. Foti*, 544 F.2d 1257, 1258 (5th Cir.1977). However, Louisiana law also provides that suit against one person tolls prescription for all persons solidarily obligated with him, even if they are not named in the original, timely complaint. La.C.C.Art. 2097.

■ Carmouche contends that because punitive damages can be awarded in a § 1983 suit, and as there can be no joint or *in solido* liability for punitive damages, he could not have been held solidarily liable for punitive damages awarded under § 1983. Therefore, he reasons, since he could not have been liable *in solido*, the tolling provision of Louisiana law does not apply, and the prescriptive period has run. This argument is meritless. Punitive damages are not an independent claim or cause of action, but are a remedy available in various causes of action. *See Alcorn County v. U.S. Interstate Supplies, Inc.*, 731 F.2d 1160, 1170 (5th Cir.1984). Carmouche has cited us to no caselaw, and we can find none, for the novel proposition that Auster had, in essence, two causes of action under § 1983: one for actual and one for punitive damages. Nor does he deny that he could validly be held liable *in solido* for actual damages under § 1983. Consequently, Carmouche was a person who could be solidarily obligated in tort

---

**6.** Appellants contend that *Wells* entitles them to a new trial on all issues, as opposed to only punitive damages. We disagree. As noted in *Westbrook v. General Tire and Rubber Co.*, 754 F.2d 1233, 1241–42 (5th Cir.1985), we need not require a new trial on all issues where passion and prejudice are shown, but only on those issues infected by it. Further, a jury may reach an acceptable verdict on liability yet be impermissibly swayed in its assessment of damages. *Id.* From our review of the record, we find it necessary to remand for a new trial, because of passion and prejudice, on the issue of punitive damages only.

with the original defendants under § 1983, and the statute was tolled by Art. 2097.

## VIII. *Auster's Standing*

 Carmouche next argues that Auster does not have standing to assert the constitutional rights of its partners and the other working interest owners in the lease, and Auster's recovery should thus be limited to damages attributable solely to its interests. This argument is also unfounded. As general partner in its drilling programs and as operator under the operating agreement, Auster had the authority and the pretrial order stated without contest[7] that Auster could represent the limited partners' and non-operating owners' interests in litigation. Fed.R.Civ.Pro. 17.

## IX. *Attorneys' Fees*

All parties challenge the award of over $300,000 in attorneys' fees. Because of our disposition of the case, we decline to rule on this issue and vacate and remand the court's judgment for further consideration in light of future developments.

**Conclusion**

In summary, we REVERSE as to the liability of Mrs. Stream. We AFFIRM as to the liability of Carmouche, Spook Stream, and M.G.S. We REMAND the issues of actual and punitive damages for new trial and attorneys' fees for reconsideration at the appropriate time.

AFFIRMED in Part, REVERSED in Part and REMANDED.

---

**7.** The pretrial order states that Auster brought this action "individually and as a general partner of Auster Oil & Gas Drilling Programs No. 4 and No. 5, and as operator of the "J" Lease, for the benefit of the owners of said lease."