Bobby **SILOR**, Plaintiff–Appellee, Cross–Appellant,

v.

James **ROMERO**, Defendant,

Gary Reynolds, etc., Defendant–Appellant, Cross–Appellee.

No. 88–4147.

United States Court of Appeals, Fifth Circuit.

April 3, 1989.

Rehearing Denied April 25, 1989.

Gregory K. Moroux, Lafayette, La., A. Lane Plauche, Lake Charles, La., for defendant-appellant, cross-appellee.

Joseph A. Koury, Stephanie M. Ackal, Lafayette, La., for plaintiff-appellee, cross-appellant.

Before REAVLEY, WILLIAMS and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Bobby Silor brought this § 1983 suit against Police Officer Gary Reynolds and Police Chief James Romero of Lafayette, Louisiana, for false arrest and malicious prosecution. The jury exonerated Romero. Reynolds appeals the $175,000 judgment against him for false arrest, and Silor appeals the grant of judgment notwithstanding the verdict negating an award of $500,000 for lost business profits. Because we find that the jury instructions were in error, we reverse the judgment and remand for a new trial on one element of the damage question.

## BACKGROUND

According to Silor,[1] the police informed him within weeks of his opening a new nightclub on the "Strip" in Lafayette that a competitor had complained about noise from his amplifiers. The police also noted certain other violations of city ordinances and zoning regulations. In his attempts to resolve these problems with the Lafayette police, Silor was approached by Officer Gary Reynolds and became convinced that he needed a "friendly voice" in the police department. Silor agreed to pay Reynolds a consulting fee to help him obtain permits for special events and to advise him on his problems.

Nevertheless, Silor was suspicious of the offer of assistance, and on advice from his attorney, he was wired with a tape recorder on the evening that he agreed to pay Reynolds his first $1,000 consulting fee. A transcript of that tape reveals that Silor asked Reynolds several times whether there was anything illegal in their agreement and stated that he would not offer the money if that was the case. Reynolds reassured him that it was all above-board, except that he was not going to pay taxes on the cash receipt. As Silor and Reynolds were leaving the nightclub, Silor was arrested and Reynolds was recorded as stating: "I've never been so disgusted in my life ... you think you could buy a policeman ..." In what must have seemed small consolation, the police were polite and efficient in the actual arrest and booking.

The bribery charges remained pending for seven months, although a copy of the tape was available to the Lafayette police department soon after the arrest. One newspaper account of the incident stated that:

A 31-year-old nightclub owner has been charged with trying to bribe a Lafayette detective into overlooking offenses that occur at his nightclub, city police said.

Bobby H. Silor, Jr. of Lafayette was arrested Friday night after a week-long investigation by nacotics detectives. He is charged with public bribery of detective Sgt. Gary Reynolds, police said.

... [The police] refused to specify the name of the nightclub and what type of offenses allegedly occurred.

On advice of counsel, Silor did not publicly disclose the existence of the tape recording until the charges were dropped. Silor sought to prove at trial that his nightclubs were ruined because of the false arrest, which generated misleading news accounts and prevented him from obtaining bank credit without substantial collateral and a co-signer.

The jury returned a $175,000 verdict against Reynolds for the false arrest. They also awarded $500,000 in lost business profits, but they refused to award punitive damages despite finding that Reynolds' actions were malicious. Reyn-

---

1. The jury apparently accepted Bobby Silor's version of the facts surrounding his arrest in

October 1983.

olds then moved for judgment notwithstanding the verdict. On January 25, 1988, the district court issued its memorandum opinion granting judgment n.o.v. on the award of $500,000 lost business profits.

## I. JURY INSTRUCTIONS

■ We first consider whether the trial court's instruction and related special issue impermissibly allowed the jury to award damages for the loss of constitutional rights as such. The district judge instructed the jury that:

> The damages you award for plaintiff's federal claim, if any, are within your discretion. You may wish to consider the importance of the right in our system of government, the role which this right has played in our history, as well as the significance of the right in the context of the society.

In addition, special verdict question number nine asked:

> 9. *Damages*
>
> What amount, if any, do you find will reasonably compensate plaintiff Bobby Silor for any deprivation of constitutional rights you may have found and/or embarrassment, humiliation, and time actually spent in custody as the result of plaintiff's arrest on October 19, 1983? Answer in dollars and cents. [$175,-000.00]

In *Memphis Community School District v. Stachura,* 477 U.S. 299, 310, 106 S.Ct. 2537, 2545, 91 L.Ed.2d 249 (1986), the Supreme Court reversed an award of damages rendered after a similar instruction. The Court held that § 1983 was designed to compensate for actual injuries; instructions that allow a jury to focus on the subjective nature of the constitutional right in question are prohibited as inconsistent with the statute's compensatory goal. Id. Thus, as the district court acknowledged in its memorandum opinion, the foregoing instruction and special jury verdict are obviously erroneous.

■ Our discussion is not at an end, however, because defense counsel did not object to the erroneous charge as required by Fed.R.Civ.P. 51. The purpose of Rule 51 is to allow a judge to correct instructional errors before the case is submitted to the jury, averting the need for a new trial. If the mandate of Rule 51 is not carefully policed, there would be little incentive to object, or even a perverse incentive not to object, to an erroneous instruction. Therefore, we are limited in appellate review to determining whether the un-objected-to instruction and special jury verdict constitute plain error such that a new trial is necessary to prevent a miscarriage of justice. *Jamison Company, Inc. v. Westvaco Corp.,* 526 F.2d 922 (5th Cir.1976) (new trial granted absent an objection where damage instructions were ambiguous); *Industrial Development Board of the Town of Section Alabama v. Fuqua Industries,* 523 F.2d 1226, 1238 (5th Cir.1975) (citing earlier cases); C. Wright, A. Miller & F. Elliott, *Federal Practice & Procedure: Civil* § 2558 at 672 (1971 & Supp.1988).

*Auster Oil & Gas, Inc. v. Stream,* 835 F.2d 597 (5th Cir.1988) involves the precise issue in this case. The *Auster* jury was instructed, without objection from the defendants, that plaintiff could "recover, if proven, damages for the violation of [its] constitutional rights." Id. at 602. Relying on *Stachura,* we reversed for a new trial, stating that:

> Where damages instructions are faulty and the verdict does not reveal the means by which the jury calculated damages, correction of the error is difficult, if not impossible. In such situations, a new trial on actual damages is required.... [Here] it is impossible for us to determine the extent to which the jury impermissibly compensated Auster for the abstract value of the deprivation of its fourth amendment rights.

Id. at 603. The district court considered *Auster* inapposite because that trial was conducted before *Stachura* was decided. We disagree. Counsel for the defendant in *Auster* was still under an obligation to object to the instructions. *Stachura* may have clarified the law, but the non-recoverability of damages for the intangible value of a constitutional right was forecast as

early as the Supreme Court's decision in *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Moreover, the error in this case goes to the heart of the jury award. As was true in *Auster*, "it is impossible for us to determine the extent to which the jury impermissibly compensated [Silor] for the abstract value of the deprivation of [his constitutional] rights."

Accordingly, we must reverse and remand for a new trial on the actual damages for the false arrest, which may include Silor's embarrassment, humiliation, and time actually spent in custody as the result of the arrest on October 19, 1983.[2]

## II. LOST BUSINESS PROFITS

■ Judgement n.o.v. on the award of Silor's lost business profits is reviewed by the familiar standard in *Boeing Company v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969). There, we held that "there must be a conflict in substantial evidence to create a jury question." Id. at 375. In addition, a plaintiff has the burden to prove the amount of his damages with a reasonable degree of certainty. *Midland Valley Plaza, Inc. v. Georgia R.R. Bank & Trust*, 542 F.2d 945, 946 (5th Cir.1976). The district court concluded that "[t]he record contains insufficient evidence to support an award of lost profits." Having reviewed the record, we agree.

Silor testified that he was part owner of two local nightclubs, both of which were successful at the time of his arrest in October 1983. Silor said that he was heavily in debt, but he was able to service that debt until sometime after his arrest. Silor produced tax receipts showing gross sales and testified regarding his gross revenue. Although he claimed that banks required collateral and a co-signer for his loans after his arrest, Silor admitted that he still was able to obtain loans thereafter.

This evidence is insufficient to support the jury's generous award of lost profits. Silor never testified or introduced any evidence that would show what profits he may have earned from these nightclubs.[3] When asked by defense counsel about his lost profits, Silor said that he might call one or two certified public accountants to quantify his losses, but they were never called. Thus, the jury could only speculate on the amount of profits, if any, that Silor made before and after his false arrest. Likewise, a jury could only speculate on the amount of lost profits, if any, caused by the alleged new credit terms, even if such were shown to have harmed his business.

In his brief on appeal, Silor practically concedes that the award of lost profits was based on speculation:

> There is no question but that plaintiff suffered a substantial business loss directly as a result of the defendant's actions, and although the figures and documents could not be submitted to the jury to support a more definite dollar amount, plaintiff certainly suffered substantial damages.

A jury needs more to base its award of lost business profits than testimony from the plaintiff that he has "suffered substantial damages." Accordingly, we affirm the district court's grant of judgment n.o.v. on the

---

**2.** There is, however, no reason to reverse the jury's denial of punitive damages, as Silor advocates. Even though the jury found that Reynolds' actions were "malicious or wanton," they refused to award punitive damages. The decision on punitive damages invokes particularly broad discretion by the jury and has a moral dimension that we should be loath to ignore. We have found no error that would have marred the jury's decision on punitive damages here.

**3.** The district court interpreted Silor's testimony as a claim that he made $30,000 of profit per month, but held that such an allegation without more was insufficient to put the matter of lost profits at issue. We interpret Silor's testimony differently. The only reference in the trial record relative to that figure refers to sales *revenue:*

Q. [By defense counsel] And what would the difference be in your revenues between allowing people on your parking lot with the ropes up and not?
A. [By Silor] Oh, I'd say about a thousand dollars a night.
Q. It's not $30,000 a night?
A. I'd say a thousand a night. That's $30,000 a month.

award of lost business profits.[4]

For the foregoing reasons, the judgment is AFFIRMED in part, and REVERSED and REMANDED in part.

---

**4.** Where there is a "remediable" defect in proof, a district court may, in rare circumstances, order a new trial rather than judgment n.o.v.   C. Wright, A. Miller & F. Elliott, *Federal Practice and Procedure:* Civil §§ 2538, 2540 (1971 & Supp.1988).   Here, the district court exercised its discretion to grant the motion for judgment n.o.v. and Silor did not subsequently move that

he be given a new trial.  Silor's brief on appeal still maintains that his proof was sufficient to raise a jury question on lost business profits, and nowhere requests the opportunity to prove lost profits in a new trial.  We are reluctant to offer this relief where it was not requested below or on appeal.