NIEMEYER, Circuit Judge,
concurring in the judgment in part and dissenting in part:
I concur in the judgment insofar as it affirms the district court’s order denying plaintiffs motion for judgment as a matter of law against the individual defendants.
I also concur in the judgment insofar as it reverses the district court’s order granting Ocean City’s motion for judgment as a matter of law on liability. In so concurring, I agree that our task is to attempt to harmonize the apparently inconsistent verdicts if there is a logical way to do so. Both Judge Shedd and Judge Traxler provide plausible explanations by which the apparently inconsistent verdicts can be harmonized.
Finally, I dissent from the judgment insofar as it upholds the jury’s verdict on damages because the damages portion of the verdict was unsupported by the evidence at trial. As I show herein, no reasonable jury could have concluded, based on the evidence in the record, that IGT sustained $250,000 in damages as a result of Ocean City’s conduct. See Price v. City of Charlotte, 93 F.3d 1241, 1249 (4th Cir.1996).
A closer reading of the record reveals that the numbers relied on by the majority to affirm the damages verdict were crude numbers tossed around by Brian Hamilton, the owner of IGT, as estimates, feelings, and “should-be’s” about the amount of his company’s losses, without any accounting for expenses or giving attention to the traditional requirements of valuing a business. There was no evidence that actually proved any damages caused by the *227 temporary suspension of IGT’s business license.
First with respect to the drop in IGT’s voucher business from $6,000 per month to $1,000 per month that the majority opinion refers to, Brian Hamilton testified:
A. I seen, you know — again, I don’t have the exact numbers. But if it was $5,000 a month in vouchers, I seen our vouchers drop down to maybe a thousand a month.
Q. And that continued through all of 2003 and into 2004?
A. Into 2004, right.
Testifying further with respect to vouchers, first those from the Board of Education and then all vouchers in the aggregate, Brian Hamilton stated:
Q. Approximately how much were you doing on a monthly basis in that work prior to May 21, 2003?
A. I don’t know. I mean total vouchers, like I said, total vouchers ... there might have been five or $6000 a month between them all.
5¡í * *
I mean during the school season, a lot of times we did more with the Board of Education, and some months could be higher. I mean I’m saying five or six. It could be eight one month and three the next. But on the average, I would say five or $6,000.
Q. And that dropped down to about a thousand?
A. Yes.
Yet, for every month from its beginning until its license was suspended, IGT lost money, losing $281,000 in the aggregate. There was no prognosis, forecast, or pro forma introduced at trial that showed that IGT could or would make a profit at any time in the future. As Brian Hamilton testified:
Q. Okay. That company, based on its P and L, had negative income for the months from October 2002 through April of 2003, correct?
A. That’s correct, but you’re not looking at the depreciation and the actual expenses that were put into doing this. It’s not just, it’s not just your ongoing day-to-day operation. I mean there was a lot put in up front.
Phones, we had $1,500 phones that were bought to put in hotels all around the City. That’s up-front cost that was booked and expensed out at one time. That phone would have been there for five years, ten years.
Q. But the net income each month from November, from October 2002 through April 2003 was a negative number, correct?
A. Correct. But it’s going to show a negative number if you’re—
Q. And the net income is minus, net taxable income is minus $281,000, correct?
A. Yes.
Hamilton never advanced a theory of reliance damages or sought to demonstrate that a reduction in vouchers increased the company’s losses for any given month. Rather, the record simply shows a continuum of monthly losses beginning months before IGT’s license was suspended.
Second, with respect to the loss of $250,000 in advertising revenue referred to by the majority opinion, Brian Hamilton testified:
Q. With respect to the advertising revenues that the cab company was experiencing to May the 21st of 2003, can you tell us what that was either on an annual basis, monthly basis?
*228 A. Well, what we had in contract was probably 50 to $75,000 under contract annual. But, you know, based on the amount of cabs that we had, with the advertising we should have had, it should have generated about $250,000 a year.
Thus, Hamilton did not testify to losing $250,000 per year. He said “we should have had” that amount. The only hard number he gave was that IGT had an existing annual contract paying $50,000 to $75,000, and he did not testify that that contract came to an end or ever stopped yielding income.
Finally, the majority opinion refers to testimony that IGT was worth approximately $4 million prior to Ocean City’s revocation of IGT’s taxicab licenses. This statement again was no more than a number pulled from the sky by Brian Hamilton. As Hamilton testified:
Q. Mr. Hamilton, as of May 2003, what value did White’s taxi, International Ground Transportation have as a company?
* * *
A. Like I said, the debt was $2 million, and based on the cash flow projections that we had on actual numbers, I would say the company was worth $4 million.
* * *
A. I’m saying based on cash flow projections. You’re asking me what do I feel the company was worth based on historic numbers that were from White’s and Sunshine and Delmarva and International combined. That’s what I would say it was worth. If you’re asking me that, that’s what I would say.
* * *
Q. But the net income each month from November, from October 2002 through April 2003 was a negative number, correct?
A. Correct.
Q. And the net income is minus, net taxable income is minus $281,000, correct?
A. Yes.
Q. But your testimony is by May of 2003, this Company is worth $4 million. A. Yes, it is.
Q. You had $2 million in debt in relation to this company?
A. Right now that’s what I have, yes. Q. What did you pay for the assets of Weimer, Inc.?
A. $350,000.
Q. You paid $350,000 for the assets of Weimer, Inc. and those were the bulk of the assets for what became International Ground Transportation, correct?
A. No. The big asset of Weimer, Inc. was, really, the major asset I got was a phone number. I threw half the cars away.
Q. Well, wasn’t there a value ascribed to the vehicles in the purchase agreement?
A. No, not that I know of.
By authorizing such vague statements, speculations, and guesswork to prove damages, the majority opinion all but undoes the universally established standard for proving damages.
The actual damages which will sustain a judgment must be established, not by conjectures or unwarranted estimates of witnesses, but by facts from which their existence is logically and legally infera-ble. The speculations, guesses, esti *229 mates of witnesses, form no better basis of recovery than the speculations of the jury themselves. Facts must be proved, data must be given which form a rational basis for a reasonably correct estimate of the nature of the legal injury and of the amount of the damages which resulted from it, before a judgment of recovery can be lawfully rendered. These are fundamental principles of the law of damages.
Central Coal & Coke Co. v. Hartman, 111 F. 96, 98 (8th Cir.1901) (overturning jury verdict on lost profits based solely on testimony of company president).
While a plaintiff is free to prove damages by circumstantial evidence, “the damages may not be determined by mere speculation or guess.” Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931). “Mathematical exactness as to the amount is not required but the evidence must form a basis for a reasonable approximation.” United States v. Griffith, Gornall & Carman, Inc., 210 F.2d 11, 13 (10th Cir.1954) (overturning lost profits claim on substantial evidence review when only testimony was the testimony of company’s president). One searches the federal reporters in vain for a case where the amount of evidence presented here was found sufficient to support a damages award. See, e.g., Kassim v. City of Schenectady, 415 F.3d 246, 250 (2d Cir.2005) (plaintiffs “vague, conclusory assertions” of lost profits could not support compensatory damages); Silor v. Romero, 868 F.2d 1419, 1422 (5th Cir.1989) (“A jury needs more to base its award of lost business profits than testimony from the plaintiff that he has ‘suffered substantial damages’ ”).
Had Brian Hamilton anticipated our lax attitude in this case, he could have multiplied his value assessment several times over because he was not required to provide any business records to corroborate the company’s alleged damages by any objective standard. His only limit on the inflation of his damages would have been his own conscience. As it is, based on the company’s purchase price of $350,000 and losses thereafter every month totaling $281,000, Hamilton was allowed to speculate that seven months later, the business was worth $4 million, even though all projections were negative.
The majority opinion generously attempts to mend Hamilton’s deficiencies, but without record support. The opinion presents IGT’s $2 million in debt as though it was incurred after Ocean City’s suspension of his license. In fact, as Brian Hamilton testified, the $2 million in debt was incurred to capitalize the company long before Ocean City’s action in suspending IGT’s license. The opinion also refers to IGT’s asset purchase agreement (entered into to start the business), a profit and loss statement, and a tax return as though they support, rather than doom the claim that there were any damages. Contrary to the majority .opinion’s statement that these documents are “other evidence presented by IGT,” these documents were actually introduced by the defense to refute Hamilton’s claim for damages. And rather than show that IGT was worth $4 million, as Hamilton claimed, they demonstrate the amount of IGT’s losses, speaking to the company’s extremely weak financial condition prior to the license suspension.
Because the plaintiff failed to prove any damages in this § 1983 case, the district court should have entered a judgment in favor of the plaintiff for nominal damages, “typically $1.00.” Price, 93 F.3d at 1246. Accordingly, I would grant Ocean City’s motion for judgment insofar as it relates to an award of damages in the amount of *230 $250,000 and remand to the district court for entry of nominal damages.